# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

───────────────────

Nº 16-CV-2156

───────────────────

## TOWN OF ISLIP,

Plaintiff,

VERSUS

## THOMAS DATRE, JR., ET AL.,

Defendants.

───────────────────

**MEMORANDUM AND ORDER**
March 28, 2017

───────────────────

JOSEPH F. BIANCO, District Judge:

On April 29, 2016, plaintiff the Town of Islip ("plaintiff" or "the Town") filed this action against Thomas Datre Jr., Thomas Datre Sr., Clara Datre, Richard Datre Jr., Christopher Grabe, Gia Gatien, Ronald Cianciulli, Joseph Montuori, Brett Robinson, Iglesia De Jesucristo Palabra Miel (the "Church"), Marco Lopez, Nancy Alvarez, William Carillo, Raul Pachecho, Walter Casasola, 5 Brothers Farming Corp., DFF Farm Corp., Datre Trucking & Farming Inc., Datre Auto & Equipment Sales Inc., Daytree at Cortland Square Inc., Daytree Custom Builders Inc., Datre Family Farms Inc., Datre Farms Realty Co. Inc., Islandia Recycling Inc., C.J. Site Development Inc., Atlas Home Improvement Corp. of Long Island d/b/a Atlas Asphalt ("Atlas"), IEV Trucking Corp. ("IEV"), COD Services Corp. ("COD"), and John Doe Nos. 1 through 10. The Complaint sets forth claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(c), 1962(d), and the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*., as well as state law claims for public nuisance, private nuisance, trespass, injury to property, joint tortfeasors, fraud and deceit, and restitution.

These claims are based on the alleged illegal dumping of hazardous waste at Roberto Clemente Park ("the Park") from July or August 2013 through April 2014 by defendants 5 Brothers Farming Corp., DFF Farm Corp., Datre Trucking & Farming Inc., Datre Auto & Equipment Sales Inc., Daytree at Cortland Square Inc., Daytree Custom Builders Inc., Datre Farms Realty Co. Inc., Thomas Datre Jr., Thomas Datre Sr., Clara Datre, Richard Datre Jr. and Gia Gatien (the "Datre defendants"), together with defendants C.J. Site Development and Christopher Grabe (the "Grabe defendants"). Defendants COD and

IEV (collectively, the "arranger defendants") allegedly acted as brokers throughout this time, arranging for the Datre and Grabe defendants to collect fill material from the John Doe defendants at various locations in Queens, Kings, Nassau, and Suffolk counties.

According to the Complaint, prior to the dumping activities, the Church, Lopez, Alvarez, Carillo, Pachecho and Casasola (collectively, the "Church defendants") had received permission to replace the topsoil and existing grass seed on one of the Park's soccer fields, and individuals were seen spreading soil on the field in May 2013. In August and October 2013, the Church defendants sent two letters to the Town acknowledging their work on the soccer field.

The Complaint further alleges that the Town closed the Park in January 2014 and ordered the removal of the dumped material. The Datre and Grabe defendants removed some of the material and contracted with Atlas and Cianciulli (the "Atlas defendants") to assist in the removal effort. Subsequently, the Suffolk County District Attorney's Office launched an investigation into the dumping activities, and, in the course of that investigation, testing revealed that the dumped material contained hazardous substances. Thomas Datre Jr. and Grabe were convicted on various charges in state court for their role in the dumping activities.

The Complaint asserts that defendants engaged in a RICO conspiracy to fraudulently conceal the disposal of hazardous substances at the Park, setting forth underlying claims for mail and wire fraud. It also alleges CERCLA claims, which assert that defendants are all potentially responsible parties for their roles in the illegal dumping, as well as various state law claims.

Before the Court are motions to dismiss filed by the arranger, Atlas, and Church defendants. As set forth in more detail below, the Court concludes, *inter alia*, that the Complaint fails to allege facts from which it could be plausibly inferred that these defendants knew, or should have known, that the material dumped at the Park by the Datre and Grabe defendants contained hazardous substances. Absent such allegations regarding knowledge, plaintiff cannot plausibly assert that the arranger, Atlas, and Church defendants engaged in mail or wire fraud by misrepresenting or concealing material information (*i.e.*, the hazardous nature of the material).

In addition, the Court concludes that, for "arranger" liability to apply under CERCLA, the Complaint must allege that an arranger knew, or should have known, that the material in question was hazardous. Given the current allegations, the Complaint fails to state plausible CERCLA claims for arranger liability against COD, IEV, and the Atlas defendants. The Complaint also fails to state a plausible claim against the Church defendants for "operator" liability because it does not allege that they exercised the requisite degree of control over the Park or the hazardous substances for such liability to apply.

Finally, the Complaint does not plausibly allege state law claims against the arranger, Atlas, or Church defendants for (1) nuisance because it does not adequately allege intent or negligence, (2) trespass because the illegal dumping was not an immediate or inevitable consequence of these defendants' actions, (3) injury to property because the underlying nuisance and trespass claims fail, (4) fraud and deceit because the Complaint fails to allege knowledge of the material's hazardous nature, and (5) restitution because the Complaint fails to allege that these defendants had a duty to assist in the remediation of the Park.

Accordingly, the Court grants the arranger, Atlas, and Church defendants' motions to dismiss. However, the Court gives the Town leave to re-plead to attempt to address thse pleading defects with additional allegations, if plaintiff can do so.

I. BACKGROUND

A. Facts

The following facts are taken from the Complaint ("Compl."). (ECF No. 1.) The Court assumes them to be true for purposes of deciding this motion and construes them in the light most favorable to plaintiff, the non-moving party.

The Town owns the Park, which consists of designated parkland located in Brentwood, New York. (Compl. ¶ 70.) In April 2013, Lopez, the Church's pastor, and Alvarez, a member of the Church, contacted the Town on behalf of the Church and requested permission to replace the topsoil and existing grass seed on one of the Park's soccer fields at the Church's own cost and with volunteer labor. (*Id.* ¶ 72.) Defendant Montuori, the Commissioner of the Parks Department, granted the Church defendants' request on behalf of the Town. (*Id.* ¶ 73.) Shortly thereafter in May 2013, several individuals were seen spreading topsoil and grass seed over roughly two-thirds of the soccer field. (*Id.*) On May 13, Alvarez sent an email to defendant Robinson, Secretary to Commissioner Montuori, asking for additional topsoil to complete the project. (*Id.*) The Church stopped working on the field in May 2013. (*Id.* ¶ 82.)

In June or August 2013, the Datre and Grabe defendants began trucking in thousands of tons of construction and demolition ("C&D") debris, contaminated fill, and other solid wastes to the Park, dumping it over the topsoil and seed the Church defendants had deposited in May. (*Id.* ¶ 74.) On August 24, 2013, the Parks Department held a press conference at the Park where attendees saw trucks marked "Datre" delivering fill to the site of the soccer field. (*Id.* ¶ 76.)

Subsequently, Town Board members and officers not employed by the Parks Department asked about the dumping activity. (*Id.* ¶ 77.) Commissioner Montuori and Robinson informed them that the Church defendants were volunteering to repair the soccer field, and the Town determined that they needed a permit to clear and grade the park, as well as consent and approval from the Town Board for any improvements by the Church defendants. (*Id.*) Commissioner Montuori and Robinson asked the Church to provide information for a land clearing permit and a letter from the Church describing the work it planned to complete. (*Id.*) On August 29, 2013, the Church faxed the Town a letter (the "August letter") signed by Lopez, stating that the Church had been working on the soccer field without pay since April 2013. (*Id.* ¶ 81.) The letter provided no other information. (*See id.*)

Meanwhile, claiming that he was working on behalf of the Church, defendant Grabe spoke with an architect and asked him for a site drawing of the soccer fields to submit to the Town with the land clearing permit information. (*Id.* ¶¶ 78–79.) The architect prepared the drawing, which did not include specifications of fill material, and provided it to Grabe. (*Id.* ¶ 80.) Grabe submitted the site drawing to the Town, and the Planning and Parks Departments reviewed it in the preparation of an application for a land clearing and grading permit. (*Id.* ¶ 83.) The Town Board subsequently granted the Church permission to spread topsoil and reseed the soccer fields at the Park. (*Id.* ¶¶ 84–85.) The Parks Department then submitted an application to the Planning Department for a Land

Clearing and Grading permit, which the Planning Department issued on September 12, 2013. (*Id.* ¶ 87.)

Around this time, deliveries of fill material ceased, and the entire area of the soccer field was buried under a layer of material, which extended into the wooded areas bordering the field. (*Id.* ¶ 89.) No additional work was performed to seed or otherwise restore the area for use as a soccer field. (*Id.*)

In October 2013, Alvarez met with Commissioner Montuori and Robinson about the work at the soccer field. (*Id.* ¶ 90.) Later, on November 18, 2013, Church members Carillo, Pacheco, and Casasola faxed a letter dated October 22, 2013 (the "October letter") to Commissioner Montuori in which they stated that the Church had worked on the field since April, but the work had ended due to lack of irrigation. (*Id.* ¶¶ 91–93.) The Church offered to resume work if the Town would agree to provide water to the site. (*Id.* ¶ 93.)

Dumping resumed at the soccer field and expanded into a new area in the Park shortly after the Town received the October letter. (*Id.* ¶ 94.) On November 21, 2013, a park ranger noticed that someone had deposited approximately 70 piles of "rocky dirt" on the soccer field, and a public safety report indicated that this dirt was unscreened and contained large boulders. (*Id.* ¶ 95.) A truck driver responsible for the dumping reported to the ranger that he was employed by Datre. (*Id.*) On November 30, 2013, the same park ranger saw additional debris deposited on the "recharge" area in the Park south of the soccer field, which, up to that time, had not been a site of previous dumping. (*Id.* ¶ 96.) In January 2014, Town personnel confirmed the presence of brick, metal, rebar, and other debris in this area, as well as heavy earth moving equipment. (*Id.* ¶ 97.) The Town closed the Park on January 23, 2014. (*Id.*)

The Town then sent a letter to Lopez and the Church ordering them to cease and desist all work in the recharge area. (*Id.* ¶ 98.) The Church defendants did not reply, but the Datre and Grabe defendants responded by removing most of the fill and depositing it in locations outside the Park. (*Id.* ¶ 99.) The Atlas defendants joined in this removal effort, removing a portion of the fill from the Park and depositing it at 117 Brook Avenue, Deer Park, New York, property owned by the Atlas defendants. (*Id.* ¶ 100.) The Atlas defendants then moved this debris from their property to other property that they used and occupied at 175 Brook Avenue in Deer Park (the "Maisie Property"). (*Id.*) The owner of the Maisie Property did not give the Atlas defendants permission to deposit this fill there. (*Id.*) On January 27, 2014, Commissioner Montuori reported that some C&D debris, contaminated fill, and other waste remained in the recharge area after the removal. (*Id.* ¶ 101.)

Dumping continued in the spring of 2014. (*Id.* ¶¶ 103–04.) On March 24, 2014, while opening the Park gate, a park ranger observed five Datre tractor trailers waiting on the road outside the Park. (*Id.* ¶ 103.) Once the gate was open, the trucks proceeded to the soccer field and dropped what appeared to be topsoil over previously deposited material, which contained large quantities of broken glass, crushed cement, and large stones. (*Id.*) Town employees saw Datre dump trucks operating in the Park as late as April 9, 2014. (*Id.* ¶ 104.)

In April 2014, the Suffolk County District Attorney's Office launched an investigation into the dumping of the C&D debris and ille-

gal fill at the Park and other locations in Suffolk County.[1] (*Id.* ¶ 105.) Soil tests of samples taken from the Park in the course of this investigation revealed the presence of hazardous substances, including asbestos, pesticides, and heavy metals. (*Id.* ¶ 106.) In response to this report, the Town undertook a removal action under the supervision of the New York State Department of Environmental Conservation. (*Id.* ¶ 107.) The Town's removal plan was approved, and removal activities commenced in June 2015. (*Id.* ¶¶ 107, 109.) In the end, a total of 39,932.44 tons of C&D debris and unacceptable fill were removed from the Park, costing the Town over $4 million. (*Id.* ¶ 110.)

Throughout this time (*i.e.*, between June 2013 and April 2014), COD and IEV acted as brokers to supply material for disposal at the Park. (*Id.* ¶ 124.) Specifically, these defendants would arrange for trucks owned or directed by the Datre and Grabe defendants to collect material at various locations owned or operated by the John Doe defendants in Kings, Queens, Nassau or Suffolk counties. (*Id.*) The Datre trucks would then transport that material to the Park for disposal. (*Id.*) During this period, the arranger defendants paid over $600,000 to various Datre defendants for the pickup and removal of over 1,200 separate loads of material, which totaled over 43,000 cubic yards. (*Id.*) IEV paid the Datre defendants over $417,000 for 759 loads of material, and COD paid them over $245,000 for 476 loads. (*Id.*) Telephone records show that, from January 1, 2013 until December 31, 2014, IEV had 151 calls with Datre Jr. and 1,331 with Grabe, while COD had 163

calls with Datre Jr. and 825 calls with Grabe. (*Id.* ¶¶ 131–32.) The purpose of these calls was to arrange pickup and delivery of the material. (*Id.*)

### B. Procedural History

The Town filed the Complaint on April 29, 2016 against all defendants. (ECF No. 1.) The Church defendants answered on June 24, 2016 (ECF No. 23), IEV answered on June 29, 2016 (ECF No. 27), and the Atlas defendants answered on July 22, 2016 (ECF No. 42). Motions to dismiss were filed by COD on August 22, 2016 (ECF No. 48), IEV on September 21, 2016 (ECF No. 52), the Church defendants on December 15, 2016 (ECF No. 63), and the Atlas defendants on December 16, 2016 (ECF No. 64). The Town filed oppositions to all these motions (ECF Nos. 53, 66, 67), and each defendant except the Atlas defendants filed a reply (ECF Nos. 56, 57, 68). Oral argument took place on February 28, 2017. (*See* ECF No. 69.) The Court has fully considered the parties' submissions.

### II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible

---

[1] Datre Jr. ultimately pleaded guilty to four Class E felony counts and four class A misdemeanor counts for his role in these activities. (Compl. ¶ 58.) With respect to the Park dumping, he pleaded guilty to a felony charge, which stated that, between May 2013 and April 2014, he recklessly disposed of over 2,000 pounds of aggregate weight of hazardous substance that he deposited in the Park, and a misdemeanor charge, which stated that he commenced operation of a solid waste management facility at the Park without a permit during that same period. (*Id.* ¶ 58(a)–(b).) Grabe pleaded guilty to similar charges. (*Id.* ¶ 60(a).)

set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth two principles for a district court to follow in deciding a motion to dismiss. 556 U.S. 662 (2009). First, district courts must "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

### III. DISCUSSION

Plaintiff brought federal claims against defendants for violations of RICO, 18 U.S.C. §§ 1964(c), 1962(d), and CERCLA, 42 U.S.C. § 9601 *et seq.* It has also brought state law claims for public nuisance, private nuisance, trespass, injury to property, joint tortfeasors, fraud and deceit, and restitution. The arranger, Church, and Atlas defendants move to dismiss all claims against them.[2] For the reasons discussed below, these motions are granted, but plaintiff is given leave to replead its claims.

---

[2] Hereinafter, "defendants" refers to the arranger defendants, Church defendants, and Atlas defendants collectively.

### A. RICO Claims

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)." 18 U.S.C. § 1962(d). Furthermore, "[w]hen § 1962 is violated, in addition to criminal penalties, the RICO statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and attorney's fees." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

Courts have described civil RICO as "'an unusually potent weapon—the litigation equivalent of a thermonuclear device.'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *see DLJ Mortg. Capital*, 726 F. Supp. 2d at

236. Indeed, although civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479–83 (S.D.N.Y. 2009) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all thirty-six cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage). Accordingly, courts have expressed skepticism toward civil RICO claims. *See, e.g.*, *DLJ Mortg. Capital*, 726 F. Supp. 2d at 236 ("[P]laintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.").

Although civil RICO presents many hurdles for a plaintiff to overcome, the Supreme Court has also "made clear that it would not interpret civil RICO narrowly." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 n.6 (2d Cir. 2001) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)). In *Sedima*, the Supreme Court rejected an interpretation of civil RICO that would have confined its application to "mobsters and organized criminals." 473 U.S. at 499. Instead, the Court held: "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* (citation omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 479 (2006) (Breyer, J., concurring in part and dissenting in part) ("RICO essentially seeks to prevent organized criminals from taking over or operating legitimate businesses. Its language, however, extends its scope well beyond those central purposes."). Thus, a court should not dismiss a civil RICO claim if the complaint adequately alleges all elements of such a claim, even if the alleged conduct is not quintessential RICO activity.

Here, defendants argue that the Town lacks standing to proceed under RICO because it has failed to exhaust its other remedies for seeking reimbursement for its cleanup costs. They also argue that the Town has failed to state a RICO claim for mail or wire fraud because the Complaint alleges no facts from which a jury could infer fraudulent intent. As set forth below, the Court agrees that the Town has failed to state a claim on which relief can be granted and, therefore, grants defendants' motions to dismiss the RICO claims. *See* Fed. R. Civ. P. 12(b)(6).

### 1. Standing

To establish standing under RICO, a plaintiff must allege "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)). Pursuant to the second requirement, "'[a] RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the RICO violation, and only when his or her actual loss becomes clear and definite.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (quoting *First Nationwide*, 27 F.3d at 767–69) (brackets omitted); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (where amount of damages was not "clear and definite," holding that "Plaintiffs lack statutory standing under RICO because their claims are unripe"). Under this rule, a claim will be dismissed for lack of statutory standing "where the extent of damages are still unknown, [and therefore] a RICO injury remains speculative and unprovable." *DLJ Mortg. Capital*, 726 F. Supp. 2d at 237 (citations omitted).

Defendants argue that the Town has not shown a "clear and definite" injury under

RICO because it has not exhausted its other remedies for the $4 million it incurred in clean-up costs, given that the Town's other claims seeking relief for this injury (*i.e.*, its CERCLA and state law claims) are still pending. Citing *Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994), *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988), *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993), *DLJ Mortgage Capital*, 726 F. Supp. 2d at 237, and *Sky Medical Supply Inc. v. SCS Support Claims Services, Inc.*, 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014), defendants contend that such exhaustion is required in the Second Circuit before a plaintiff may bring RICO claims.

The Court disagrees. All of the cases cited by defendants (except *Commercial Union*) involved situations where the amount of damages suffered was directly dependent on either a separate, ongoing proceeding—the results of which would determine whether or to what extent the plaintiff suffered an injury—or a debt recoverable via foreclosure. None of them stand for the broad principle that, before bringing a RICO claim, all plaintiffs must exhaust every alternative means of recovery.[3]

At the outset, the Court concludes that *Commercial Union* is inapposite. In that case, the Second Circuit simply held that the plaintiff investors could not maintain a RICO action after receiving the amount they lost in investments via settlement. *Commercial Union*, 17 F.3d at 612. The Second Circuit thus held that the plaintiffs failed to state damages recoverable under RICO. *Id.* ("Hence, in the instant case, without provable damages, no viable RICO cause of action may be maintained."). This case says nothing about RICO standing where, as here, a plaintiff has not recovered anything for an injury suffered as a result of a RICO enterprise.

Similarly, *DLJ Mortgage Capital* does not support defendants' position because it simply applied the well-established rule that, where a creditor-plaintiff alleges an injury from a fraudulently-induced mortgage, the plaintiff must pursue foreclosure remedies provided by the mortgage before filing a RICO claim for the lost debt. *See* 726 F. Supp. 2d at 237; *see also First Nationwide*, 27 F.3d at 769 ("[T]he loss [the plaintiff] would suffer as to those loans [the plaintiff] has not finally foreclosed cannot yet be determined. Only when [the plaintiff's] actual loss becomes clear and definite will the claims be ripe for suit."); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) ("[W]hen a creditor alleges he has been defrauded[,] RICO injury is speculative when contractual or other legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced." (citing *Bankers Trust*, 859 F.2d at 1106; *First Nationwide*, 27 F.3d at 769)). Only after the plaintiff pursues this remedy could a court determine the extent of the injury resulting from the fraudulently-induced mortgage. *See DLJ Mortg. Capital*, 726 F. Supp. 2d at 237. That a creditor must foreclose or otherwise attempt to collect on a debt prior to bringing a RICO claim does not imply that all other plaintiffs, including those not collecting on a debt, must pursue non-RICO claims first.

---

[3] Indeed, this proposition stands at odds with the common practice of bringing RICO claims alongside other federal and state claims. *See, e.g.*, *Breslin Realty Dev. Corp. v. Schackner*, 457 F. Supp. 2d 132, 133 (E.D.N.Y. 2006); *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68 (E.D.N.Y. 2006); *City of N.Y. v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005); *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 804 (E.D.N.Y. 2003); *Pahmer v. Greenberg*, 926 F. Supp. 287 (E.D.N.Y. 1996).

In the remaining cases, the alleged injuries all depended on the outcome of ongoing proceedings. In *Bankers Trust*, for example, the plaintiff's "RICO claim for injuries suffered as a result of its lost debt overlap[ped] with the ongoing proceedings in the bankruptcy court," and, thus, the plaintiff lacked standing. 859 F.2d at 1106. Specifically, the Court found that

> (1) [the plaintiff] was injured by the identical transactions that injured the bankrupt corporation, and (2) should the corporation, through its trustee in bankruptcy, recover for its injury, [the plaintiff's] injury will itself be reduced. For instance, should the bankruptcy trustee ultimately recover all the fraudulently transferred assets, [the plaintiff's] injury could be significantly reduced; conversely should the assets never be recovered, or should the bankruptcy court order the claim abandoned, [the plaintiff's] injury would be much more severe.

*Id.* Thus, the amount of damages turned on whether the plaintiff could collect on its debt, which, in turn, depended on the outcome of the ongoing bankruptcy proceedings. *See id.* ("[A]t this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation. Should they be recovered, [the plaintiff] would benefit along with [the corporation's] other creditors and its injury would decrease.").

Likewise, in *Stochastic Decisions*, the plaintiff, a judgment creditor, brought a RICO claim alleging a conspiracy to prevent it from satisfying its outstanding judgment obtained in New Jersey against the defendants, claiming that the amount of the judgment was recoverable under RICO as "lost debt." 995 F.2d at 1162–63. The Second Circuit, however, refused to recognize the judgment amount as RICO damages, given that "the amount of [the plaintiff's] 'lost debt' [could] not be determined at [that] time because of the ongoing efforts to collect those judgments." *Id.* at 1165. Once again, therefore, the amount of the alleged RICO injury turned on the outcome of ongoing proceedings on a non-RICO claim. *See id.*

Finally, *Sky Medical* dealt with New York's no-fault automobile insurance scheme, which allows an insurer to deny a claim for medical treatment if a physician finds that treatment is not medically necessary during an independent medical examination ("IME"). *See Sky Medical*, 17 F. Supp. 3d at 215 (summarizing New York's scheme). The scheme also permits the claimant to "seek immediate redress" for such a denial by filing suit in state court or submitting the dispute to arbitration. *Id.* In *Sky Medical*, the plaintiff alleged that the defendants committed RICO fraud by fabricating IME reports, and that courts and arbitrators had relied on these fraudulent IME reports in denying the plaintiff's claims against defendants in other proceedings. *Id.* at 217–18. The plaintiff admitted, however, that some of the denials underlying its RICO claims were still pending before state courts or arbitrators, and the plaintiff did not separate its RICO claims based on proceedings that had concluded (in which case the fraud had produced an injury) and those that had not (in which case no injury had occurred yet). *Id.* at 231. In other words, plaintiff alleged that it suffered harm because courts and arbitrators had denied its claims based on the defendants' fraud, but, in some of the cases identified in the complaint, those same courts and arbitrators *had not yet*

*denied the plaintiff's claims. Id.* at 231. Thus, this Court concluded that "the extent of the injury plaintiffs have alleged—wrongful denial of their insurance claims—is contingent upon determinations in state court and arbitration proceedings that plaintiff is not entitled to reimbursement for its claims." *Id.* at 231–32. The Court, therefore, held that the

> plaintiff's damages [were] not 'clear and definite' for so long as some of the no-fault claims that form the basis of plaintiff's RICO causes of action are still being litigated in state court or arbitration. Plaintiff could prevail on some or all of those claims, which would reduce the amount that plaintiff could recover under RICO.

*Id.* at 233. Accordingly, given the plaintiff's failure to separate his claims based on concluded and pending proceedings, this Court dismissed all of the RICO claims. *Id.*

As defendants correctly point out, this Court in *Sky Medical* rejected the argument that RICO's ripeness doctrine was limited to the context of secured lenders pursuing non-paying debts. *Id.* at 232. Nevertheless, neither *Sky Medical* nor the cases on which *Sky Medical* relied in reaching this conclusion embraced the broad exhaustion principle for which defendants advocate now. As noted above, *Sky Medical* applied the ripeness doctrine because the plaintiff's claimed injury was based on the outcome of court and arbitration proceedings that were still ongoing. *See* 17 F. Supp. 3d at 231–33. This Court did not dismiss the RICO claims based on a general failure to exhaust the plaintiff's fraud claims through other, non-RICO theories of liability. *See id.* On the contrary, this Court noted that, under existing case law, "a plaintiff need not exhaust all possible remedies in state court before bringing a RICO suit." *Id.*

at 234 (citing *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 365–66 (E.D.N.Y. 2012)).

In holding that RICO's ripeness doctrine was not limited to the secured lender context, moreover, this Court relied on *Uzan*, 322 F.3d at 135, *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, 347 Fed. App'x 711, 713 (2d Cir. 2009) (summary order), and *DeSilva v. North Shore–Long Island Jewish Health Systems, Inc.*, 770 F. Supp. 2d 497, 521 (E.D.N.Y. 2011). None of these cases impose a broad requirement of complete exhaustion of RICO claims via non-RICO causes of action. *Uzan* involved a RICO claim that arose in connection with a loan from the plaintiffs to the defendants secured by shares in the defendants' company. 322 F.3d at 133. At the time of the RICO lawsuit, however, the plaintiffs had not sought foreclosure on the collateral, and the defendants had initiated arbitration pursuant to the loan agreement seeking to reschedule payments. *Id.* at 134. The Second Circuit held that the plaintiffs lacked standing because "the RICO damages sought are in respect of a loss that would be abated to the extent that: Plaintiffs realize value on the collateral; Plaintiffs recover in the Swiss arbitrations; or the size of the debt on the underlying contracts, or the obligation to pay it, is affected by any ruling on [the company's] defenses in the Swiss arbitration that is binding and enforceable." *Id.* at 136. Thus, like in *Sky Medical*, the extent of the plaintiffs' injury was directly dependent on the outcome of another proceeding. *See id.* The same is true for *Harbinger Capital*, 347 Fed. App'x at 713—where the Court found that, "if the [Bankruptcy] Trustee succeed[ed] in its recovery actions, Appellants, as first-in-line creditors, [would have] potentially experience[d] some recovery on the loan they claim[ed] damages for" in the instant action. Meanwhile, *DeSilva* concerned injuries that had not yet occurred. Specifically, the *DeSilva* plaintiffs' alleged injury—

their inability to bring timely claims for unpaid wages—was "contingent upon a court actually dismissing those hypothetical claims as time-barred," but no court had done so at the time of the RICO suit. 770 F. Supp. 2d at 521.

In sum, the cases cited by defendants simply indicate that, where a plaintiff raises a RICO claim whose injury is dependent on the outcome of an ongoing proceeding or a debt recoverable via foreclosure, the injury is not "clear and definite" enough for the plaintiff to have RICO standing. Here, however, the Town's RICO claims are not dependent on an unpaid debt or ongoing proceedings in other forums. Instead, the Town has alleged a concrete, particularized injury, namely the loss of $4 million in clean-up costs, as a result of the RICO enterprise. (Compl. ¶ 110.) Therefore, the Town has satisfied the injury requirement, and its RICO claims are ripe for review.

### 2. Particularity and Intent

As predicate acts for its RICO claims, the Town alleges that defendants engaged in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (*See* Compl. ¶ 134 (mail and wire fraud by all defendants); *id.* ¶ 128 (wire fraud by Church defendants); *id.* ¶¶ 131–32 (wire fraud by arranger defendants); *id.* ¶ 134 (mail fraud by arranger defendants); ¶ 135 (wire fraud by Atlas defendants).) When alleging fraudulent activities as predicate acts for a RICO claim, a plaintiff must satisfy the particularity requirements of Rule 9(b). *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999). Specifically, a RICO plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999).

If "there are multiple defendants involved, the plaintiff must connect the allegations of fraud to each individual defendant." *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F. Supp. 1224, 1231 (E.D.N.Y. 1996). For example, in *Moore*, the court held that a complaint met this heightened pleading standard where it "contain[ed] a chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these mailings and cross-references to the paragraphs of the complaint in which the mailings [were] further discussed." 189 F.3d at 173; *see also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1326 (S.D.N.Y. 1997) (holding that complaint met particularity requirement where, for each defendant, the "[p]laintiffs identif[ied] and quote[d] from specific written materials they allege[d] were distributed to and relied upon by them, and describe[d] how these materials were false or failed to disclose material information"). By contrast, in *Colony at Holbrook*, 928 F. Supp. at 1231, the court held that a complaint did not meet Rule 9(b)'s heightened pleading standard because it did not include "statements setting forth the content, date, or place of any alleged misrepresentations, and the identity of the persons making them." *Id.* (brackets omitted). Instead, the complaint "contain[ed] sweeping and general allegations of mail and wire fraud directed at all the defendants rather than connecting the alleged fraud to the individual defendants." *Id.*; *see also McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-392 FB CLP, 2009 WL 2132439, at *5 (E.D.N.Y. July 10, 2009) (holding that a plaintiff failed to plead fraud with particularity where he "loosely allege[d] throughout his complaint that the defendants contacted each other by means of the mails and/or the wires, without specifying precise methods of communication" or identifying "any specific fraudulent statement").

Furthermore, although a plaintiff may "allege fraudulent intent generally" under

Rule 9(b), it still "must provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995); *see also Moore*, 189 F.3d at 173. A complaint satisfies this standard by either (1) "alleg[ing] a motive for committing fraud and a clear opportunity for doing so" or (2) "identifying circumstances indicating conscious behavior by the defendant." *Powers*, 57 F.3d at 184. Under the "motive and opportunity" approach, "[a]lthough the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." *ABF Capital*, 957 F. Supp. at 1327 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Indeed, "a generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent." *Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.*, No. 07-CV-1471 RRM/LB, 2009 WL 928718, at *6 (E.D.N.Y. Mar. 31, 2009) (collecting cases).

Meanwhile, under the "conscious behavior" approach, "the strength of the circumstantial evidence must be greater." *ABF Capital*, 957 F. Supp. at 1326 (citing *Powers*, 57 F.3d at 184). In *ABF Capital*, for example, a plaintiff adequately alleged "conscious behavior" indicative of fraud where the facts showed that the defendant "represented that it had reduced the art of valuing and modeling [collateralized mortgage obligations] to a 'proprietary, quantitative' science, when in fact it was relying on intuition and pressure from [its] Brokers." *Id.* at 1327. On the other hand, in *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 298 (S.D.N.Y. 2000), *aff'd,* 2 F. App'x 109 (2d Cir. 2001), the court concluded that

a plaintiff did not allege "conscious behavior" that sufficed to establish fraudulent intent where the "facts [in the complaint could] only lead to the inference that [the defendant] and its principals successfully did business with their long-time business contacts," who had allegedly committed fraud.

### a. Arranger Defendants

Here, the Town has not adequately pleaded fraud with particularity or fraudulent intent against the arranger defendants. First, like the complaint in *Colony at Holbrook*, the Complaint here does not identify any statements made by the arranger defendants that were fraudulent, much less the person who made those statements, the time they were made, or their content. *See Colony at Holbrook*, 928 F. Supp. at 1231; *see also McGee*, 2009 WL 2132439, at *5. Instead, it merely asserts the arranger defendants made a number of phone calls to the Datre and Grabe defendants and that "a substantial portion, if not all of these calls, were made to arrange pickup and delivery of contaminated fill, C&D or other solid waste to [the Park], or to conceal or otherwise advance the activities of the [RICO] Enterprise." (Compl. ¶ 131; *accord id.* ¶ 132.) This is a far cry from *Moore*'s highly detailed chart that laid out with specificity the allegedly fraudulent statements. 189 F.3d at 173. Instead, it is much closer to the "sweeping and general allegations of mail and wire fraud" that proved insufficient to meet Rule 9(b)'s heightened pleading standard in *Colony at Holbrook*. 928 F. Supp. at 1231. Therefore, the Town has not met that standard here.

In addition, even if the Town had specified particular fraudulent statements, identified the speaker, outlined the time and place they occurred, and explained why they were fraudulent, *see Anatian*, 193 F.3d at 88, the Complaint does not set forth facts "that give

rise to a strong inference of fraudulent intent," *Powers*, 57 F.3d at 184. In particular, the Town has not explicitly alleged *any* motive for the arranger defendants to engage in fraudulent conduct, as required to establish intent under the motive and opportunity approach. *See id.* Instead, the Complaint merely sets forth the amounts paid by the arranger defendants to the Datre defendants for the transportation of the material from the pickup sites to the Park. (*See* Compl. ¶ 124.) Given the absence of any allegations about how much the John Doe defendants paid the arranger defendants for arranging removal of the material, however, the amounts the arranger defendants paid do not even establish a "generalized profit motive" to engage in fraud, which still would be insufficient to establish intent. *Brookdale*, 2009 WL 928718, at *6.

Nor does the Complaint allege "circumstances indicating conscious behavior by the [arranger] defendant[s]" showing fraudulent intent. *Powers*, 57 F.3d at 184. The multitude of phone calls between the arranger defendants and the Datre and Grabe defendants—and the payments made to the Datre defendants—merely establish that the arranger defendants had a business relationship with *other companies* that were allegedly engaged in criminal conduct. The existence of such a relationship, without more, is not enough to establish fraudulent intent on the part of the arranger defendants. *See Odyssey*, 85 F. Supp. 2d at 298 ("Plaintiff must allege more than that defendants had worked together previously to create an inference of the fraudulent intent to enter into a conspiracy against this particular plaintiff."); *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 630 (S.D.N.Y. 2003) ("[M]ere allegations that Defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in the Complaint, are insufficient, standing alone, to set forth a conspiracy claim."), *aff'd*, 355 F.3d 206 (2d Cir. 2004).

Accordingly, the RICO claims against the arranger defendants are dismissed.

### b. Atlas Defendants

Furthermore, the Complaint fails to state RICO claims against the Atlas defendants for the same reasons it fails to state claims against the arranger defendants. Specifically, the Complaint neither identifies a specific statement made by Atlas or Cianciulli that constitutes fraud nor sets forth facts that establish a motive to engage in fraudulent activity or conscious behavior indicative of fraudulent intent. (*See* Compl. ¶¶ 100, 122 135.) Therefore, the RICO claims against the Atlas defendants are dismissed.

### c. Church Defendants

Finally, the Town has also failed to state a RICO claim against the Church defendants. First, for defendants Alvarez, Carillo, Pacheco, and Casasola, the Complaint does not meet Rule 9(b)'s heightened pleading requirements. With respect to Alvarez, the Complaint alleges that she made "22 separate telephone calls with [Grabe] between January 1, 2013 and December 31, 2014" and that, "[o]n information and belief, these telephone calls were made to maintain the façade that the Church membership, and no others, were conducting work at [the Park]." (Compl. ¶ 128.) As with the arranger defendants, this vague reference to several different phone calls between Alvarez and Grabe—without specifying the date or the content of those calls—is not enough to satisfy Rule 9(b)'s requirement to "specify the statements that the plaintiff contends were fraudulent . . . state where and when the statements were made, and . . . explain why the statements were fraudulent." *Anatian*, 193 F.3d at 88; *see also Colony at Holbrook*, 928 F. Supp. at 1231; *McGee*, 2009 WL 2132439, at *5. Also, the calls were between Alvarez and Grabe, not

Alvarez and the Town. Indeed, the Complaint does not allege that Alvarez made any fraudulent communication with the Town that could provide a basis for fraud liability.

As for Carillo, Pacheco, and Casasola, the Town alleges that they made a fraudulent statement in the October letter when they said that "the congregation of [the Church] has been working on the 'Ball Field' at [the Park], without pay, since April 2013" because "work performed by members of the Church congregation had ceased in May 2013." (Compl. ¶ 92.) The next paragraph of the Complaint, however, belies this assertion of falsity because it acknowledges that the October letter also informed the Town that the Church's work at the Park "had stopped." (*Id.* ¶ 93.). In other words, the October letter stated that the Church had worked on the soccer field, but this work had ended. Thus, the Complaint does not adequately explain why the October letter was fraudulent. *Compare Houraney v. Burton & Assocs., P.C.*, 701 F. Supp. 2d 258, 262 (E.D.N.Y. 2010) (holding that plaintiff failed to explain why statement was fraudulent where it was "not necessarily inconsistent" with plaintiff's factual allegations), *with Nanjing Standard Int'l, Ltd. v. DMD Int'l Ltd.*, No. 12 CIV. 8248 LLS, 2013 WL 5882928, at *3 (S.D.N.Y. Oct. 25, 2013) (holding that plaintiff explained why statements were fraudulent where "[t]he complaint allege[d] that defendants' statements request[ed] port fees and customs taxes . . . [but] no such fees or taxes were due").

In any event, the Complaint fails to plead facts giving rise to a "strong inference" of fraudulent intent on the part of any of the Church defendants. The Complaint offers no explanation for why the Church defendants would "maintain the façade that the Church membership, and no others, were conducting work at [the Park]" as a cover for the illegal dumping activities by the Datre and Grabe defendants (Compl. ¶ 128), and, thus, the Town has not alleged "a motive for committing fraud and a clear opportunity for doing so," *Powers*, 57 F.3d at 184. Nor is the August letter—which merely stated that the Church had "been working on the 'Ball Field' at [the Park], without pay, since April 2013" (Compl. ¶ 81)—so blatantly false or misleading as to permit an inference of fraudulent intent on behalf of Lopez or the Church, much less the remaining Church defendants who had nothing to do with the letter. *See ABF Capital*, 957 F. Supp. at 1327. As such, the RICO claims against the Church defendants are dismissed.

* * *

In short, the Court concludes that the Town has standing to pursue its RICO claims but has failed to state a RICO claim against defendants because the Complaint does not meet Rule 9(b)'s pleading requirements or allege sufficient facts that would allow for an inference of fraudulent intent.

In addition, the Town's overarching theory of RICO fraud is that all of the defendants engaged in an enterprise to dump hazardous waste at the Park and lie to the Town about their activities. (*See* Compl. ¶ 127 ("The purpose of the enterprise was to arrange and facilitate the unlawful disposal of contaminated fill, C&D debris and other solid wastes at multiple locations in Suffolk County. . . . The racketeering activity that is the subject of this action is the illegal disposal of contaminated fill, C&D debris and other solid wastes at [the Park].") As discussed below, however, the Complaint alleges no facts from which it could be inferred that (1) the arranger, Church, or Atlas defendants knew, or should have known, that the material the Datre defendants deposited in the Park was hazardous; (2) the Church defendants knew, or should have known, that the material was waste; or (3) the arranger defendants knew,

or should have known, that the material would be transported to the Park or other illegal dumping locations. In other words, the Town alleges that defendants engaged in a scheme to illegally dispose of hazardous waste at the Park, but fails to allege that they knew, or should have known, that the material was hazardous, waste (for the Church defendants), or meant for delivery at the Park (for the arranger defendants). Absent allegations of such knowledge, and given plaintiff's theory of fraud, the Court concludes that the Complaint does not "state a claim to relief that is *plausible* on its face" under RICO as to the arranger, Church, and Atlas defendants. *Twombly*, 550 U.S. at 570 (emphasis added).

Relatedly, to the extent that the Town bases its RICO fraud claims on the arranger, Atlas, and Church defendants' concealment of the dumping scheme (rather than affirmative misrepresentations), *see United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."), the claims still fail because the Town has not alleged that defendants knew, or should have known, the material information they are alleged to have concealed (*i.e.*, that the material was hazardous), *see Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 179 n.26 (E.D.N.Y. 2010) ("[M]ail and wire fraud are 'specific intent crimes' requiring proof of defendant's 'conscious knowing intent to defraud.'" (quoting *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991))), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011).

Accordingly, the Court grants defendants' motions to dismiss with respect to the RICO claims.[4]

## B. CERLCA Claims

Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution," designing it "to promote the timely cleanup of hazardous waste sites and to ensure that the

---

[4] The Court further notes that the Complaint does not adequately allege the use of interstate wires or mails. *See Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) ("The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires. The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails." (citation omitted)). Specifically, it appears that the phone calls and letters serving as the basis for the fraud claims all took place between residents of New York (*see, e.g.*, Compl. ¶¶ 14, 15, 43, 128–32, 135–36), and communications between residents of the same state are presumed to be intrastate, *see DeFazio v. Wallis*, 500 F. Supp. 2d 197, 204 (E.D.N.Y. 2007). Plaintiff's conclusory assertion that defendants "transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures and sounds" in furtherance of the scheme to defraud does not cure this defect because it is a legal conclusion, not a factual statement. *See Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)); *Tracy v. NVR, Inc.*, No. 04-CV-6541L, 2009 WL 3153150, at *3 (W.D.N.Y. Sept. 30, 2009) ("[C]ourts have dismissed complaints containing no factual allegations, but only legal conclusions tracking the language of a statute." (collecting cases)). Although the phone records the Complaint references may ultimately "provide evidence that signals were 'transmitted or caused to be transmitted by means or wire communications in interstate or foreign commerce'" (Pl.'s Reply Mem. Opp'n to COD's Mot. to Dismiss, ECF No. 59 ("Pl.'s COD Opp'n"), at 2), those factual allegations are not presently in the Complaint, and, therefore, it is deficient on the interstate commerce element.

costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). The statute imposes strict liability on four classes of "potentially responsible parties" ("PRPs"):

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

*Id.* at 608–09 (quoting 42 U.S.C. § 9607(a)) (footnote omitted). If a person or entity "is identified as a PRP, it may be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs." *Id.* at 609; *see also* 42 U.S.C. § 9613(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . .").

The Complaint alleges that COD, IEV, and the Atlas defendants are liable as arrangers under § 9607(a)(3). (Compl. ¶ 160.) It also alleges that the Church defendants are liable as operators under § 9607(a)(1). (*Id.* ¶ 158.) The arranger and Atlas defendants argue that the Town has not pleaded sufficient facts to demonstrate that they knew the material transported by or for Datre (1) was hazardous or (2) was meant for disposal at the Park. The Church defendants assert that the Complaint does not set forth facts demonstrating that they were "operators" of the Park within the meaning of the statute. For the reasons outlined below, the Court concludes that the Town has not stated a claim against defendants under CERCLA and, therefore, dismisses the CERCLA claims.

### 1. Arranger Defendants

As noted above, an entity becomes liable under § 9607(a)(3) if "by contract, agreement, or otherwise," it "arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by . . . any other party or entity, at any facility . . . operated by another party or entity and containing such hazardous substances." The Supreme Court has indicated that liability plainly attaches under this subsection when an entity "enter[s] into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Burlington N.*, 556 U.S. at 610. Conversely, "an entity [can] not be held liable as an arranger merely for selling a new and useful product if

the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.*

When the arrangements "fall between these two extremes," such as when "the seller has some knowledge of the buyers' planned disposal," the Court has indicated that liability is "[l]ess clear." *Id.* In these circumstances, "the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* In deciding what types of arrangements fall into this category, the Supreme Court concluded that arranger liability under CERCLA implicitly creates an exception to the statute's strict liability provisions. *See id.* at 611. Specifically, the Court held that "the word 'arrange' [in the statute] implies action directed to a specific purpose," and, consequently, "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.*

The parties here dispute the scope of this intent requirement. On the one hand, the arranger defendants argue that a plaintiff must allege that the arranger intentionally disposed of a hazardous substance at a particular site. (*See* COD's Mem. Supp. Mot. to Dismiss, ECF No. 48-7 ("COD's Br."), at 17–18.) In other words, according to the arranger defendants, a plaintiff must establish that the arranger knew (1) that the material was meant for disposal (rather than, *e.g.*, sale), (2) where the material was to be deposited, and (3) that the material was hazardous. On the other hand, the Town argues that a plaintiff need only allege that the arranger intended to arrange for the material's disposal, and, therefore, it is irrelevant whether the arranger knew where the material was to be deposited

or that it was hazardous. (Pl.'s COD Opp'n at 13.)

Although the language and logic the Supreme Court employed in *Burlington Northern* support defendants' argument on the intent requirement with respect to the hazardous nature of the material (as discussed below), the factual and legal issues in that case were distinct from the instant case. In *Burlington Northern*, the arranger defendant, Shell Oil Company ("Shell"), sold products containing hazardous substances to a distributor. 556 U.S. at 602–03. The distributor's "delivery spills, equipment failures, and . . . rinsing of tanks and trucks allowed [the products] to seep into the soil and upper levels of ground water of the . . . facility" where the distributor operated. *Id.* at 604. The plaintiffs sued Shell under CERCLA after the distributor went out of business, asserting arranger liability. *Id.* at 605. The Supreme Court held that "Shell was not liable as an arranger for the contamination that occurred at [the] . . . facility" because Shell did not intend "that at least a portion of the product be disposed of during the transfer process." *Id.* at 612–13. Instead, Shell's intent was to sell the distributor "an unused, useful product," and, therefore, its "mere knowledge that spills and leaks continued to occur [was] insufficient grounds for concluding that Shell 'arranged for' the disposal of [the products] within the meaning of § 9607(a)(3)." *Id.* at 613.

*Burlington Northern* thus focused entirely on the arranger's intent with respect to the nature of the transaction. Accordingly, Shell's knowledge of the ultimate destination of its products or those products' hazardous composition was not at issue. It follows that *Burlington Northern* provides no direct guidance on the issue presented here, *i.e.*, whether an alleged arranger must know the disposal location or whether the material was hazardous. Indeed, given the Town's allegation that the arranger defendants entered into their

transactions with the Datre, Grabe, and John Doe defendants to dispose of the Doe defendants' unwanted material, the "sale vs. disposal" issue in *Burlington Northern* is not present here. (*See* Compl. ¶ 124 (alleging that IEV and COD "acted as brokers to supply contaminated fill, C&D material and other solid wastes . . . *for disposal* at [the Park]" (emphasis added).)

The arranger defendants cite *Schiavone v. Northeast Utilities Services Co.*, No. 3:08CV429 AWT, 2011 WL 1106228 (D. Conn. Mar. 22, 2011) and *Hobart Corp. v. Waste Management of Ohio Inc.*, 840 F. Supp. 2d 1013, 1027 (S. Dist. Ohio 2011), to support their argument for an enhanced intent requirement. *Schiavone* concerned the defendants' sale of used transformers as scrap metal to the plaintiffs' predecessor-in-interest between 1968 and 1978. 2011 WL 1106228, at *1–2. Some of the oil in the transformers contained hazardous substances known as polychlorinated biphenyls ("PCBs"). *Id.* at *2. In 1973, the defendants issued a policy requiring their operating companies to drain used transformers of oil containing PCBs before selling the transformers. *Id.* By 1976, the defendants were selling the used transformer oil for commercial value or disposing of it by means of disposal services, but they never targeted the predecessor for the sale or disposal of the oil. *Id.* Their interactions with the predecessor were limited to the sale of transformers. *See id.* at *6. After the State of Connecticut discovered contamination on the plaintiffs' property, the plaintiffs remediated the property and sued the defendants for contribution based on a theory of arranger liability. *Id.* at *3.

Although it was "undisputed that the defendants had a specific purpose of disposing of used transformers," the court determined that the plaintiffs "produced no evidence that could support a conclusion that the defendants had as a purpose in their dealings with [the predecessor] disposing of transformer oil containing PCBs." *Id.* at *6. The court reasoned that "the defendants' specific intent to dispose of the transformers themselves is not enough to make them 'arrangers' under § 9607(a), even if the defendants had knowledge that oil was in the used transformers when they sold them." *Id.* (citing *Burlington N.*, 556 U.S. at 612). Therefore, the court granted the defendants' motion for summary judgment because "the plaintiffs [had] not created a genuine issue of material fact as to whether the defendants arranged for the disposal of a hazardous substance, *i.e.*, PCBs." *Id.*

In *Hobart Corp.*, the court considered two separate claims, a "base claim" and a "migration claim," for arranger liability against the defendants. 840 F. Supp. 2d at 1027. The base claim alleged that they "directly disposed of wastes at the Site that included hazardous substances." *Id.* at 1022. In other words, the defendants "contributed to contamination at the Site, through [their] disposal of wastes that included hazardous substances at the Site." *Id.* at 1018. The "migration claim" alleged that the defendants "allowed hazardous substances on their adjacent properties to migrate and contaminate the Site." *Id.* at 1027. Specifically, one defendant allegedly "released hazardous substances on its property adjacent to the Site and allowed these hazardous substances on its property to migrate through the groundwater to contaminate the Site," and another defendant's adjacent property "contain[ed] hazardous substances which [the defendant] . . . failed to contain and . . . allowed . . . to migrate through the groundwater to contaminate the Site." *Id.*

The court held that, by alleging direct disposal of the material by the defendants, the base claim "unquestionably state[d] a plausible claim" under CERCLA. *Id.* Despite the Complaint's failure to plead intent, the court

concluded that "the state of mind is implied in the very nature of the alleged disposal activity." *Id.* Indeed, the court equated the base claim with "the easy case posited by the Supreme Court where 'CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance.'" *Id.* (quoting *Burlington N.*, 556 U.S. at 610). The migration claim, on the other hand, did not set forth a plausible claim for arranger liability because it "more vaguely allege[d] conduct on adjacent properties that ultimately impacted the Site in question" without specifying whether the defendants released hazardous substances on the adjacent properties "'with the intention that at least a portion of the product be disposed of during the [release].'" *Id.* (quoting *Burlington N.*, 556 U.S. at 612) (alteration in original).

Like *Burlington Northern*, both of these cases are factually inapposite. First, in *Schiavone*, the court determined that the plaintiffs failed to demonstrate intent because the evidence established that the defendants only meant to dispose of the transformers, not the oil within them that actually contained the hazardous substances. 2011 WL 1106228, at *6. Here, conversely, the Town has alleged that the arranger defendants arranged for the disposal of the exact material that contained the hazardous substances. (*See* Compl. ¶ 124.) The facts of *Schiavone* would be analogous to this case if the defendants there had intended to dispose of the *oil*, rather than the transformers. In other words, the oil in that case is analogous to the material deposited at the Park here, as both contained hazardous substances. As the defendants in *Schiavone* only disposed of the transformers, however, it is distinguishable factually.

*Hobart Corp.* is also distinguishable. The Town argues that its claims against the arranger defendants are comparable to the base claim in *Hobart Corp.* (Pl.'s COD Opp'n at 16.) Unlike that claim, however, the Complaint does not allege that the arranger defendants physically participated in the disposal of the material at the Park. *See* 840 F. Supp. 2d at 1018, 1022. The arranger defendants, meanwhile, argue that the Town's claims against them are closer to the migration claim in that, like the migration defendants, they are "only alleged to have acted in a manner that resulted in the hazardous material being placed on the Town's property." (COD's Br. at 16–17.) In *Hobart Corp.*, however, it was unclear whether the defendants intended to dispose of the released substances when those substances migrated to the site at issue. *See* 840 F. Supp. 2d at 1027 (focusing on lack of allegation that the defendants released the substances "with the intention that at least a portion of [them] be disposed of"). Thus, the issue was not whether the defendants "acted in a manner that resulted in the hazardous material being placed on the [plaintiff's] property" (COD's Br. at 16–17), but whether they intended to dispose of that material, *see Hobart Corp.*, 840 F. Supp. 2d at 1027. As noted above, the Town has adequately alleged that the arrangers intended to arrange for the disposal of the material. (Compl. ¶ 124.)

Importantly, like *Burlington Northern*, neither *Schiavone* nor *Hobart Corp.* asked whether the defendants knew (1) where the material would be deposited or (2) that the material was hazardous. Other cases, however, have addressed these issues. In a case that was favorably cited in *Burlington Northern*, for example, the Sixth Circuit declined to adopt the first requirement for which defendants advocate concerning the disposal location. *See United States v. Cello-Foil Prod., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996) ("[O]nce it has been demonstrated that a party possessed the requisite intent to be an arranger, the party cannot escape liability by claiming that it had no intent to have the

waste disposed in a particular manner or at a particular site."); *see also Burlington N.*, 556 U.S. at 611. The Eighth and Eleventh Circuits have similarly declined to require proof that the defendant knew where the material was to be deposited. *See United States v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir. 1989) ("Courts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere." (collecting cases)); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir. 1990) ("[E]ven though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable."). For its part, the Second Circuit has recognized that "arranger liability can attach to parties that do not have active involvement regarding the timing, manner or location of disposal," thus suggesting that knowledge of the precise disposal location is immaterial. *See Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992).

The Court agrees with the principle of these cases that alleged arrangers "cannot escape liability by 'contracting away' their responsibility or alleging that the incident was caused by the act or omission of a third party." *Aceto*, 872 F.2d at 1381 (quoting *State of N.Y. v. Gen. Elec. Co.*, 592 F. Supp. 291, 297 (N.D.N.Y. 1984)). As such, the Court applies the rule adopted in *Cello-Foil* (and suggested by *AAMCO Transmissions*) that a defendant may still be held liable as an arranger even if it has "no intent to have the waste disposed in a particular manner or at a particular site." *Cello-Foil*, 100 F.3d at 1232. *Burlington Northern*, moreover, does not mandate otherwise, given the Supreme Court's favorable citation to *Cello-Foil* and exclusive focus on intent with respect to the fact of disposal, rather than the location, in

that case. *See* 556 U.S. at 612–13. Therefore, because the Town alleges that the arranger defendants were arranging for the material's disposal (Compl. ¶ 124), the Court concludes that their lack of knowledge regarding the disposal location does not render the Town's CERCLA claims defective. *See Cello-Foil*, 100 F.3d at 1232; *Aceto*, 872 F.2d at 1381; *Florida Power & Light*, 893 F.2d at 1318; *AAMCO*, 962 F.2d at 286.

Separately, few courts have addressed whether an arranger defendant must know that the material in question is hazardous, but the case most directly on point did impose such a knowledge requirement. *See Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D. Wis. July 3, 2012), *aff'd sub nom. NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014). *Appleton Papers* concerned the recycling of "broke," an industry term for the trim, cuttings, and waste created during the process of making or coating paper. *Id.* at *1. The court concluded that the plaintiff (on a counterclaim by the defendants) "was not an arranger [in part] because it . . . lacked knowledge that broke . . . could be hazardous." *Id.* at *12. Based on *Burlington Northern*'s indication that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance," the court reasoned that "[i]t seems doubtful that a defendant can *ever* be found to be an arranger if he did not know the substance in question is hazardous." *Id.* at *11 (quoting *Burlington N.*, 556 U.S. at 611). It also highlighted additional language from *Burlington Northern* to support this conclusion:

> [W]hen the *Burlington Northern* court notes that "if an entity were to enter into a transaction for the sole purpose of discarding a used and no

longer useful hazardous sub-
stance," it is implicit or as-
sumed in such a statement that
the entity *knew* or at least sus-
pected that the substance was
harmful.

*Id.* (quoting *Burlington N.*, 556 U.S. at 610).

Beyond the language of *Burlington Northern*, the court also found support for its interpretation from "the underlying purpose of arranger liability under CERCLA." *Id.* The purpose of arranger liability, the court reasoned, is "to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." *Id.* (quoting *United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012)). Where "the dangerousness of the product is unknown to the would-be arranger," however, "it is difficult to find that the disposer was trying to evade liability for that danger." *Id.* In addition, absent knowledge of the substance's hazardous nature, "there is no conduct to deter by imposing arranger liability because the disposal was essentially an innocent act: people who do not even suspect that their product is harmful are not in a position to be deterred." *Id.*

This Court agrees with the analysis in *Appleton Papers*. First, as the court in that case correctly pointed out, the language in *Burlington Northern* suggests that the alleged arranger must know the substance in question was hazardous. *See id.* Indeed, if, as the Town argues, knowledge of the hazardous nature of the material were irrelevant—and the only inquiry was whether the alleged arranger intended for the disposal of some material—the Supreme Court could have omitted the term "hazardous" from its holding, in which case the holding would have read, "[U]nder the plain language of the statute, an entity may qualify as an arranger . . . when it

takes intentional steps to dispose of a . . . substance." *See Burlington N.*, 556 U.S. at 611. Instead, the Court required "intentional steps to dispose of a *hazardous* substance." *Id.* (emphasis added). Courts applying *Burlington Northern*, moreover, have consistently mirrored this language to include the term "hazardous" in describing the relevant intent. *See, e.g., Gen. Elec. Co.*, 670 F.3d at 383 ("[F]ollowing *Burlington Northern,* a discernible element of intent to dispose of a *hazardous* substance is necessary for an entity to be sanctioned pursuant to § 9607(a)(3)." (emphasis added)); *Team Enterprises, LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 908 (9th Cir. 2011) ("[A]ctions taken with the *intent* to dispose of a *hazardous* substance are sufficient for arranger liability." (second emphasis added)); *Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 149 (4th Cir. 2015) ("[I]ntent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a *hazardous* substance." (emphasis added)).

The Court also agrees that requiring knowledge of the substance's hazardous nature comports with CERCLA's purpose of preventing responsible parties from "contracting away" their liability and deterring them from attempting to do so. *See Appleton Papers*, 2012 WL 2704920, at *11. First, as the *Appleton Papers* court correctly concluded, imposing liability on parties lacking this knowledge would not deter them from arranging for the disposal of a product they do not believe to be harmful. *See id.* It cannot be said, moreover, that such a party was attempting to "contract away" its responsibility for polluting if it did not even realize it was polluting. *See id.*

This interpretation is also consistent with the Supreme Court's recognition that parties who arrange for the sale of a useful product that contains hazardous substances are not liable as arrangers under CERCLA even when

they know the substances "will be leaked, spilled, dumped, or otherwise discarded." *Burlington N.*, 556 U.S. at 510 (holding that such knowledge "may provide evidence of the entity's intent to dispose of its hazardous wastes" but "alone is insufficient to prove that an entity 'planned for' the disposal"). Under this rule, a party who sells a product *knowing* it contains hazardous substances and *knowing* that those substances will be discarded is not liable as long as the party did not intend for the buyer to dispose of it. In this Court's view, the seller's knowledge of the pollution that will result from the sale renders the seller *more culpable* for the resulting contamination than an entity who arranges for the disposal of a product it does not even realize poses a risk of contamination. It would be anomalous, therefore, to hold the less culpable entity liable while permitting the more culpable seller to escape liability. *See Burlington N.*, 556 U.S. at 602 ("[CER-CLA] was designed . . . to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."); *Chitayat v. Vanderbilt Assocs.*, 702 F. Supp. 2d 69, 76 (E.D.N.Y. 2010) ("Congress enacted CERCLA for the purpose of ensuring 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'" (quoting S. Rep. No. 848, 96th Cong., 2d Sess. 13 (1980))); *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003) ("[A] court should not lose sight of the ultimate purpose of [of CERCLA], which is to determine whether a defendant was sufficiently responsible for hazardous-waste contamination so that it can fairly be forced to contribute to the costs of cleanup.").

The Third Circuit employed similar reasoning in *Morton International*. 343 F.3d at 678. There, the court held that "ownership or possession [of a hazardous substance] alone [was not] a sufficient basis upon which to ground 'arranger liability'" because such a rule "could broaden the sweep of Section 107(a)(3) beyond the bounds of fairness." *Id.* As an example, the court posited that "it would be unfair to require [a] defendant to contribute to the cost of cleanup" if that defendant merely "arranges for a plant to treat a hazardous substance that [the defendant] owns or possesses, but [had] . . . no knowledge (or even reason to know) that the processing will result in the release of hazardous waste." *Id.* In other words, the Third Circuit indicated that arranger liability should not extend to an entity that is innocent of any wrongdoing by virtue of its lack of knowledge about the pollution that could result from its arrangements. *See id.* Requiring the alleged arranger to know that the material in question contains hazardous substances follows from this holding.

Finally, and most importantly, the imposition of a knowledge requirement concerning the hazardous nature of the substance is consistent with the language of the statute. As relevant here, arranger liability under § 9607(a)(3) attaches to "any person who . . . arranged for disposal or treatment . . . *of hazardous substances*." (emphasis added). As noted above, *Burlington Northern* observed that "the word 'arrange' implies action directed to a specific purpose," 556 U.S. at 611, and, by the terms of the statute, that "specific purpose" is not the disposal of any substance but the disposal of *hazardous* substances, *see* § 9607(a)(3). Thus, just as the term "arrange" implies a specific intent to dispose of the substance, *see Burlington N.*, 556 U.S. at

611, so too does it imply knowledge that the substance is hazardous.[5]

Consequently, the Court concludes that, for arranger liability to apply, a plaintiff must establish that the defendant who arranged for the disposal of material knew, or should have known, that the material contained hazardous substances. *See Appleton Papers*, 2012 WL 2704920, at *11–12; *Burlington N.*, 556 U.S. at 611. The Complaint here, however, does not allege that the arranger defendants knew the material Datre dumped at the Park contained hazardous substances. Instead, it simply alleges that the arranger defendants "had knowledge of the disposal of the materials they arranged to transport." (Compl. ¶ 125.) Furthermore, the facts alleged in the Complaint regarding the arranger defendants—that they made various phone calls to the Datre and Grabe defendants and acted as brokers between those defendants and the John Doe defendants—do not give rise to an inference that they knew, or should have known, of the material's hazardous nature. (*Id.* ¶¶ 130–35.) For instance, it contains no allegation that the price they paid for the disposal of the material was so unusually low as to suggest wrongdoing or that the Datre and Grabe defendants had a history of environmental contamination of which the arranger defendants were aware. As such, based on the current allegations in the Complaint, the Town has not stated a plausible claim for arranger liability under CERCLA against the arranger defendants.

### 2. Atlas Defendants

The same is true for the Atlas defendants. The Complaint only alleges that, after the Town requested removal of the material from the Park, the Atlas defendants participated in that removal effort. (*Id.* ¶ 100.) It contains no facts from which it could be inferred that the Atlas defendants knew that the material they transported from the Park contained the hazardous substances later uncovered in the investigation by the Suffolk County District Attorney's office. Accordingly, the Town has failed to state a plausible claim for arranger liability against the Atlas defendants.

### 3. Church Defendants

As noted above, under § 9607(a)(1), the "operator of a vessel or a facility" may be held liable for clean-up costs. The Supreme Court has defined an "operator" as "someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998). "[S]harpen[ing]" this definition, the Court ruled that, to be held liable as an "operator," a defendant "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67. The Second Circuit has held that the Supreme Court's "sharpened construction" of the term "operator" is "sufficiently broad to extend beyond titular owners and day-to-day operators," but

---

[5] The Town correctly points out that "CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). Nevertheless, the Supreme Court has also made clear that arranger liability "may not extend beyond the limits of the statute itself." *Burlington N.*, 556 U.S. at 510. For the reasons set forth above, the Court concludes that construing

§ 9607(a)(3) to contain no knowledge requirement relating to the hazardous nature of the substances would "extend [arranger liability] beyond the limits of the statute itself," *id.*, and thereby "broaden the sweep of Section 107(a)(3) beyond the bounds of fairness," *Morton Int'l*, 343 F.3d at 678.

still "implies a level of control over the hazardous substances at issue." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 444 (2d Cir. 2009) (brackets and emphasis omitted).

Correspondingly, "although the imposition of operator liability does not require a finding that the defendant directly participated in the day-to-day activities at the site, an operator under CERCLA must make the relevant decisions on a frequent, typically day-to-day basis." *City of N.Y. v. N.Y. Cross Harbor R.R. Terminal Corp.*, No. 98-CV-7227 (ARR) (RML), 2006 WL 140555, at *12 (E.D.N.Y. Jan. 17, 2006) (citations, emphasis, and brackets omitted). Individuals found to be operators are usually "actively involved in decision-making concerning environmental compliance or hazardous waste disposal on a regular, ongoing basis." *Id.* at *13 (collecting cases). Conversely, "an individual officer or director who has only limited or sporadic involvement in environmental compliance issues or hazardous waste disposal cannot be considered an operator for CERCLA purposes." *Id.* (collecting cases).

Under this body of law, the Complaint does not plausibly allege that the Church defendants "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution." *Bestfoods*, 524 U.S. at 66–67. The Town argues that the Complaint satisfies this standard because it alleges that the Church defendants approached the Town to place topsoil at the Park, Church members were present at the Park, and Church members sent the August and October letters assuming responsibility for the work done there. (Pl.'s Mem. Opp'n to Church Defs.' Mot. to Dismiss, ECF No. 66 ("Pl.'s Church Opp'n"), at 18.)

These allegations, however, do not state a plausible claim with respect to the requisite degree of control over the Park or the hazardous material for operator liability. First, the Complaint mentions only one instance where purported members of the Church were seen spreading topsoil, and that instance occurred in May 2013, well before the Datre and Grabe defendants began dumping the material later determined to contain hazardous substances. (Compl. ¶ 73.) The Complaint contains no allegation that the Church defendants were spreading hazardous material on the soccer field at that time, and this single instance is hardly sufficient to show that Church members were present at the Park when the dumping of the hazardous material by the Datre and Grabe defendants occurred, much less that the Church defendants themselves "conduct[ed]" the dumping "operations." *Bestfoods*, 524 U.S. at 67. Relatedly, contrary to the Town's assertion that the Church defendants had control over the soccer field portion of the Park (Pl.'s Church Opp'n at 18), the Complaint contains no allegation that the Church defendants had the capacity to grant the Datre and Grabe defendants access to the Park. Indeed, the only allegation concerning access suggests otherwise. (*See* Compl. ¶ 103 (alleging that the Datre defendants entered the Park after a park ranger opened the gate).)

Furthermore, that the Church defendants requested permission to spread topsoil from the Town and later sent letters acknowledging that they had worked on the field in April 2013—again, months before the dumping began—does not suggest that they "manage[d]" or "direct[ed] . . . operations specifically related to pollution." *Id.* At best, it might be inferred from the letters that the Church contracted with the Datre and Grabe defendants to deposit the material at the Park, but such a contractual arrangement is not a basis for *operator* liability. *See* 42 U.S.C. § 9607(a) (distinguishing between liability for the "operator of a vessel or a facility" and for "any person who by contract, agreement, or otherwise

arranged for disposal . . . of hazardous substances. . . ."); *Delaney v. Town of Carmel*, 55 F. Supp. 2d 237, 261 (S.D.N.Y. 1999) (holding that a town was not liable as an operator where it entered into a lease with private parties for the disposal of septic tank and cesspool waste, but the plaintiffs "offer[ed] no evidence . . . to suggest that [the town] carried out disposal activities at the Site, provided personnel, equipment, or supplies, had, or exerted, any control over the activities or management at the Site"). In any event, the Complaint is devoid of any factual allegations that such a contractual arrangement existed.[6] For these reasons, the Town has failed to plausibly allege that the Church defendants were "operators" within the meaning of § 9607(a)(1). Accordingly, the CERCLA claims against the Church defendants are dismissed.

### 4. Contribution Claim

Defendants also move to dismiss the Town's CERCLA contribution claims. Under 42 U.S.C. § 9613(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title. . . ." As set forth above, the Court concludes that the arranger, Atlas, and Church defendants are not "potentially liable under section 9607(a)," *id.*, and, thus, are not subject to contribution under § 9613(f). Therefore, the contribution claims against the arranger, Atlas, and Church defendants are dismissed.[7]

### C. State Law Claims

Finally, defendants move to dismiss the Town's state law claims against them for public nuisance, private nuisance, trespass, injury to property, fraud and deceit, and restitution.[8] As set forth below, the motions are granted with respect to the state law claims.

---

[6] The Complaint does not seek to hold the Church defendants liable as arrangers. (*See* Compl. ¶ 158.) Even if it did, however, it does not contain any allegation that the Church defendants knew the dumped material contained hazardous substances and, therefore, would fail for the same reasons as the CERCLA claims against the arranger and Atlas defendants.

[7] Given the Court's rationale for dismissing the contribution claims, it need not and does not address defendants' alternative argument that the Town has not "resolved its liability to the United States or a State . . . in an administrative or judicially approved settlement" within the meaning of § 9613(f)(3)(B). (*See* COD's Br. at 18–19.)

[8] The Town has voluntarily withdrawn its joint tortfeasors claim against the arranger and Church defendants. (*See* Pl.'s COD Opp'n at 23; Pl.'s Church Opp'n at 22.) Given that the Atlas defendants expressly joined with the arranger defendants' argument on this claim (Atlas Defs.' Letter Mot. to Dismiss, ECF No. 64, at 5), and the Town does not advance this claim in its response to the Atlas defendants' motion (*see* Pl.'s Opp'n to Atlas Defs.' Mot. to Dismiss, ECF No. 67, at

3), the Court construes its withdrawal of the joint tortfeasors claim as extending to the Atlas defendants. In any event, the claim fails because the Town has not alleged that it incurred liability to a third party. *See MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 407 (N.D.N.Y. 2013) ("Under New York law, a party who voluntarily makes a payment has no right to seek indemnification for a loss it was not obligated to pay in the first instance. . . . Because Plaintiff's payment . . . was made voluntarily to cover costs it incurred by choice rather than by legal obligation to a third party, it is not a payment that can support Plaintiff's claims for indemnification and contribution.").

### 1. Supplemental Jurisdiction

As a threshold matter, the Church defendants argue that this Court should decline to exercise supplemental jurisdiction over the state law claims because the Town fails to state federal claims against them under RICO or CERCLA. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). As discussed above, the Church defendants are correct that the Complaint fails to state federal claims against them (as well as the arranger and Atlas defendants), but the Court concludes that the exercise of supplemental jurisdiction is appropriate because the federal claims against the Datre and Grabe defendants remain, and the state law claims against the arranger, Atlas, and Church defendants "derive from a common nucleus of operative fact," namely, the dumping of the material at the Park. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Stokes v. City of Mount Vernon, N.Y.*, No. 11 CV 7675 VB, 2013 WL 1222720, at *1 (S.D.N.Y. Mar. 25, 2013) (exercising supplemental jurisdiction over state law claims against individual defendants where federal claims against them were dismissed because the pending federal claims against the city "ar[o]se from the same common nucleus of operative fact as the state claims against the individual defendants").

### 2. Public and Private Nuisance

Under New York law, "[t]he elements for public and private nuisance are generally the same." *Cangemi v. United States*, 939 F. Supp. 2d 188, 205 (E.D.N.Y. 2013). To state a claim for private nuisance, "a plaintiff must allege: '(1) an interference substantial in nature; (2) intentional or negligent in origin; (3) unreasonable in character; (4) with plaintiff's right to use and enjoy land; (5) caused by defendant's conduct in acting or failing to act." *Id.* at 203. Likewise, for public nuisance, a plaintiff must allege

1. The existence of a public nuisance—a substantial interference with a right common to the public;

2. negligent or intentional conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and

3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of that public nuisance.

*N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003). Significantly, both torts require intentional or negligent conduct on the part of a defendant.

Although "the release or threat of release of hazardous waste into the environment" is clearly a nuisance, *N.Y. v. W. Side Corp.*, 790 F. Supp. 2d 13, 29 (E.D.N.Y. 2011), the Town has failed to sufficiently plead intentional or negligent conduct that would give rise to nuisance liability under New York law. First, as discussed above, the Complaint is devoid of any allegation from which it could be inferred that the arranger, Atlas, or Church defendants knew the material dumped at the Park by the Datre and Grabe defendants was hazardous. Accordingly, it cannot be said that they intentionally contributed to the nuisance created by the Datre and Grabe defendants. Likewise, the Complaint does not allege that the arranger, Atlas, or Church defendants had an affirmative duty to ascertain whether the dumped material was hazardous, as required to allege negligence, *see Taunus Corp. v. City of N.Y.*, 279 F. Supp. 2d 305, 312 (S.D.N.Y. 2003) ("When a claim of nuisance is based on negligent conduct, the plaintiff will have to prove all the elements of negligence, including duty."). Therefore, the

Complaint fails to state a plausible claim for public or private nuisance against the arranger, Atlas, or Church defendants.

### 3. Trespass

A "trespass" under New York law is "the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 885 F. Supp. 410, 424 (E.D.N.Y. 1994). To state a trespass claim, a plaintiff must allege "an intentional entry onto the land of another without justification or permission," with "intent . . . defined as intending the act which produces the unlawful intrusion, where the intrusion is an *immediate or inevitable* consequence of that act." *Marone v. Kally*, 109 A.D.3d 880, 882 (N.Y. App. Div. 2013) (emphasis added).

The Complaint fails to allege a trespass with respect to the arranger, Atlas, and Church defendants. First, as noted above, the Complaint does not allege that the arranger defendants directly disposed of hazardous material at the Park. Instead, it seeks to hold them liable to the extent they facilitated the dumping by the Datre and Grabe defendants. The arranger defendants, however, only acted as brokers, connecting the John Doe defendants with the Datre and Grabe defendants. Absent knowledge of the material's hazardous nature or the Datre and Grabe defendants plan to unlawfully dump material at the Park, the unlawful dumping was not "an immediate or inevitable consequence" of the arranger defendants' brokering activities. *Id.*

Second, the Complaint is devoid of any allegation that the Atlas defendants trespassed *against the Town*. On the contrary, the Town alleges that the Atlas defendants *assisted* the Town by removing some of the dumped material from the Park and transporting it elsewhere. (*See* Compl. ¶ 100.) Although the Complaint does allege that the Atlas defendants deposited that material at the Maisie Property without the permission of the owner (*see id.*), the trespass claim is based entirely on the dumping that occurred at the Park (*see id.* at ¶¶ 193–96). In any event, absent special circumstances not alleged here, the Town lacks standing to bring a trespass claim on behalf of a private individual like the owner of the Maisie Property. *See In re Dynegy, Inc.*, 770 F.3d 1064, 1068 (2d Cir. 2014) ("In general, a plaintiff lacks standing to assert the rights or interests of third parties.").

Finally, the Complaint does not allege that the Church defendants intentionally entered the Park without permission. The only direct entry by the Church defendants alleged in the Complaint occurred in May 2013, when unidentified individuals assumed to be affiliated with the Church were seen spreading topsoil on the soccer field. (Compl. ¶ 73.) The Complaint concedes, however, that the Church defendants had permission from the Town at this time to enter the Park and spread topsoil on the soccer field. (*See id.* (alleging that Commissioner Montuori "permitted the Church to begin work in or around May of 2013 at the Church's sole cost and expense").) Presumably referring to the August and October letters, the Town argues that the Church defendants are liable for trespass because they took "responsibility for continuing the delivery of material to the Park in the name of the Church and further [took] responsibility for the deposition of the materials there." (Pl.'s Church Opp'n at 21.) The Court finds it implausible, however, to read the August and October letters as taking responsibility for the Datre and Grabe defendants' illegal dumping activities, especially given that they had no apparent motive to do so. Instead, the only reasonable reading of the letters is that they are referring to the May

27

2013 activities. Nor can the Church defendants' be said to have "established control over the wastes that were delivered to the Park, and control over the soccer field portion of the Park" for the same reasons that they cannot be deemed "operators" under CERCLA. (Pl.'s Church Opp'n at 21.) More importantly for the trespass claim, the dumping by the Datre and Grabe defendants was certainly not "an immediate or inevitable consequence of" the act of sending the letters, nor does the Complaint allege any actions by the Church defendants that would immediately or inevitably result in such activities. *Marone*, 109 A.D.3d at 882.

As such, the Town has failed to state plausible claims for trespass against the arranger, Atlas, and Church defendants.

### 4. Injury to Property

Under New York law, "'injury to property' is an actionable act, whereby the estate of another is lessened, other than a personal injury, or the breach of a contract." N.Y. Gen. Constr. Law § 25-b. As such, "any tortious act (other than personal injury) resulting in damage . . . constitutes an injury to property." *Lippes v. Atl. Bank of N.Y.*, 69 A.D.2d 127, 140 (N.Y. App. Div. 1979). The Town cites its nuisance and trespass claims as the grounds for its injury to property claim (Pl.'s COD Opp'n at 23; Pl.'s Church Opp'n at 22), but, as discussed above, the Complaint fails to state plausible claims for those torts. Accordingly, it fails to state a claim for injury to property.

### 5. Fraud and Deceit

To state a claim for fraud under New York law, a plaintiff must allege "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and

(5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). A plaintiff may premise a state law fraud claim "on acts of concealment where the defendant had a duty to disclose material information." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 118 (S.D.N.Y. 2009) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 119 (N.Y. App. Div. 2003)).

As set forth at length above with respect to the Town's RICO claims, the Complaint does not sufficiently allege that the arranger, Atlas, or Church defendants made statements to the Town that they knew to be false with the intent to defraud the Town. The Town, therefore, has not alleged that defendants made a material misrepresentation known to be false and with the intent to defraud. In addition, as discussed in connection with the Town's CERCLA claims, the Complaint does not allege that defendants knew that the material deposited at the Park by the Datre and Grabe defendants was hazardous. Thus, it does not allege that they engaged in an act of concealment because concealment requires knowledge of the material information. *See Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029, 1039 (S.D.N.Y. 1980) ("Fraudulent concealment requires knowledge."). Accordingly, the Complaint fails to state a plausible claim for fraud under New York law.

### 6. Restitution

Under New York law, a "person who has performed *the duty of another* by supplying things or services although acting without the other's knowledge or consent, is entitled to restitution from the other if (a) he acted unofficiously and with intent to charge therefor, and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety." *City of N.Y. v. Lead Indus. Ass'n, Inc.*, 222

A.D.2d 119, 125 (N.Y. App. Div. 1996) (emphasis added). The Town's restitution claim is predicated on the assumption that the arranger, Atlas, and Church defendants had a duty to assist with the clean-up of the Park by virtue of their complicity in the dumping activities by the Datre and Grabe defendants. As discussed above, the Complaint does not sufficiently allege that the arranger, Atlas, and Church defendants are liable for these activities under RICO, CERCLA, or state law. Therefore, the Complaint does not adequately allege a duty on the part of these defendants to assist in the remediation efforts and, thus, fails to state a claim for restitution.[9]

### D. Leave to Amend

Despite the Town's failure to state any plausible claims against the arranger, Atlas, or Church defendants, the Court grants the Town leave to amend its Complaint. Federal Rule of Civil Procedure 15(a)(2) states that a district court "should freely give leave [to amend] when justice so requires." Moreover, although the Town has not specifically requested it, "the Court may *sua sponte* grant leave to amend." *Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 102 (E.D.N.Y. 2004). A district court's discretion to grant such leave "is broad," and depends upon "many factors, including 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Under this liberal standard, the Court concludes that it is appropriate to grant leave to amend

in the instant case. In particular, the Court notes that the Town's action against the Datre and Grabe defendants will continue, and the defects in plaintiff's Complaint with respect to the arranger, Church, and Atlas defendants is largely a failure to allege sufficient facts to identify the fraudulent conduct or demonstrate the relevant knowledge on the part of these defendants. In other words, better pleading could correct the defects identified in plaintiff's Complaint. Accordingly, the Court grants plaintiff leave to file an amended complaint if it wishes to maintain this action against the arranger, Church, and Atlas defendants.

### IV. Conclusion

In sum, for the above reasons, the Court grants the motions to dismiss filed by the arranger, Church, and Atlas defendants and grants the Town leave to amend its Complaint. The Town shall have thirty days from the date of this Memorandum and Order to file its amended complaint.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 28, 2017
     Central Islip, NY

* * *

Plaintiff is represented by Michael J. Cahill and Guy W. Germano of Gemano & Cahill, P.C., 4250 Veterans Memorial Highway, Suite 275, Holbrook, NY 11741. Defendant COD is represented by Laurel R. Kretzing and Jeffrey D. Lebowitz of Jaspan Schlesinger LLP, 300 Garden City Plaza, Garden

---

[9] To the extent the Town argues for restitution based on unjust enrichment, the Complaint fails to state how

the defendants were unjustly enriched as a result of their alleged role in the dumping activities.

City, NY 11530. Defendant IEV is represented by Michael D. Cassell of Hogan & Cassell LLP, 500 North Broadway, Suite 153, Jericho, NY 11753. The Atlas defendants are represented by John F. Carman, Esq., 666 Old Country Rd., Garden City, NY 11530. The Church Defendants were represented by Alesia J. Kantor, of the Law Offices of Joseph F. Kilada, P.C., 100 Quentin Roosevelt Blvd., Suite 208, Garden City, NY 11530, on this motion, but Ms. Kantor has since withdrawn as counsel.