UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

TOWN OF ISLIP,

                              Plaintiff,

                    v.

THOMAS DATRE JR., THOMAS DATRE SR.,
CLARA DATRE, CHRISTOPHER GRABE, 5
BROTHERS FARMING CORP., DFF FARM
CORP., DATRE TRUCKING & FARMING INC.,
DATRE AUTO & EQUIPMENT SALES INC.,
DAYTREE AT CORTLAND SQUARE INC.,
DAYTREE CUSTOM BUILDERS INC., DATRE
FAMILY FARMS INC., ISLANDIA RECYCLING
INC., C.J. SITE DEVELOPMENT INC., COD
SERVICES CORP., 96 WYTHE ACQUISITION
LLC, 61 PARK PLACE LLC, 4111 18TH AVENUE
LLC, THE CLASSON IN CLINTON LLC, CHEN
867 REALTY LLC, STAHAV REALTY CORP.,
JOHN KHANI, and JOHN DOE NO. 1
THROUGH JOHN DOE NO. 10,

                            Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
16-CV-2156 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff the Town of Islip (the "Town") commenced the above-captioned action on April

29, 2016, against Defendants Thomas Datre Jr., Thomas Datre Sr., Clara Datre, *et al.*[1] under the

---

[1] Plaintiff originally commenced the action against the following Defendants: Thomas
Datre Jr., Thomas Datre Sr., Clara Datre, Richard Datre Jr., Christopher Grabe, Gia Gatien,
Ronald Cianciulli, Joseph Montuori, Brett Robinson, Iglesia De Jesucristo Palabra Miel (the
"Church"), Marco Lopez, Nancy Alvarez, William Carillo, Raul Pachecho, Walter Casasola, 5
Brothers Farming Corp., DFF Farm Corp., Datre Trucking & Farming Inc., Datre Auto &
Equipment Sales Inc., Daytree at Cortland Square Inc., Daytree Custom Builders Inc., Datre
Family Farms Inc., Datre Farms Realty Co. Inc., Islandia Recycling Inc., C.J. Site Development
Inc., Atlas Home Improvement Corp. of Long Island d/b/a Atlas Asphalt ("Atlas"), IEV
Trucking Corp. ("IEV"), COD Services Corp. ("COD"), and John Doe Nos. 1 through 10.

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* ("RICO"), the

Comprehensive Environmental Response, Compensation, and Recovery Act, 42 U.S.C. § 9601,

*et seq.* ("CERCLA"), and state causes of action.  (Compl. ¶¶ 1, 113–230, Docket Entry No. 1.)

Plaintiff filed an Amended Complaint on April 27, 2017, alleging RICO, CERCLA, and assorted

state law claims, (Am. Compl., Docket Entry No. 74), and a Second Amended Complaint

("SAC") on May 24, 2019, alleging RICO, CERCLA, and state law causes of action for

negligence, public nuisance, private nuisance, trespass, injury to property, and seeking restitution

and crime victim relief.  (SAC ¶¶ 159–295, Docket Entry No. 173.)  Pursuant to CERCLA,

Plaintiff seeks environmental response costs for work done to restore Roberto Clemente Park

(the "Park"), where hazardous materials were unlawfully dumped in or around May of 2013, and

continuing through about May of 2014.[2]  (*Id.* ¶¶ 3, 200–14.)  In the alternative, Plaintiff seeks

contribution under CERCLA for costs associated with the restoration of the Park.  (*Id.* ¶¶ 215–

22.)  Defendants Thomas Datre Sr., Clara Datre, Daytree at Cortland Square Inc., and Daytree

Custom Builders (collectively, the "Opposing Defendants") filed a Second Amended Answer

("SAA") to the SAC on February 7, 2020, asserting counterclaims against Plaintiff for First

Amendment retaliation under 42 U.S.C. § 1983, Fourteenth Amendment substantive due process

and procedural due process violations under 42 U.S.C. § 1983, conspiracy to violate the First

Amendment and the Fourteenth Amendment under 42 U.S.C. § 1983, and

indemnification/contribution for negligence and respondeat superior/negligent supervision.

(SAA ¶¶ 335–418, Docket Entry No. 268.)  The Opposing Defendants allege that Plaintiff named

---

[2] Plaintiff brings the action under New York Town Law § 65, which authorizes a town's board to bring an action or special proceeding for the town's benefit or protection, to enforce any liability created, or to recover damages for any injury to property or rights for which defendants may be liable.  (SAC ¶ 2.)

them as Defendants solely to punish them for filing and pursuing an action against the Town in this District, *Daytree at Cortland Square Inc., et. al. v. Michael P Walsh, et. al.*, 15-CV-2298.[3] (*See id.* ¶¶ 335–42.)

Plaintiff now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, requesting that the Court dismiss all counterclaims asserted by the Opposing Defendants; the Opposing Defendants oppose the motion.[4]

For the reasons discussed below, the Court grants Plaintiff's motion and dismisses the Opposing Defendants' counterclaims.

## I.   Background

The following facts are undisputed unless otherwise noted.  (Pl.'s Stmt. of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1"), Docket Entry No. 307-1; Defs.' Rule 56.1 Counter-Stmt. ("Defs.' 56.1"), Docket Entry No. 309-26.)

### a.   The parties

Plaintiff is a municipal corporation duly organized under the laws of the State of New York.  (Pl.'s 56.1 ¶ 11.)  Defendants Thomas Datre Sr. and Clara Datre were officers and/or owners of Daytree Custom Builders Inc., Daytree at Cortland Square, Inc., and Datre Farms Realty Co.  (*Id.* ¶ 12; Defs.' 56.1 ¶ 12.)  Defendant Datre Jr. is the son of Datre Sr. and Clara Datre.  (Pl.'s Mem. 1; Defs.' Opp'n 6–7.)  Defendant COD Services Corp. ("COD") is a

---

[3]   The Clerk of Court terminated *Daytree at Cortland Square, Inc., et. al. v. Michael P Walsh, et. al.*, 15-CV-2298, on August 2, 2021, after Judge Frederick Block granted summary judgment in favor of the defendants.

[4]   (Pl.'s Mot. for Summ. J., Docket Entry No. 307; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket Entry No. 307-37; Defs.' Mem. in Opp'n to Pl.'s Mot. ("Defs.' Opp'n"), Docket Entry No. 309-27; Pl.'s Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), Docket Entry No. 308.)

domestic business corporation organized under the laws of the State of New York, was a broker for the removal and disposal of construction waste containing hazardous substances from construction sites in the New York City metropolitan area, and arranged for the disposal of construction waste by the Opposing Defendants, who transported the waste to the Park.[5] (Pl.'s 56.1 ¶ 13.) IEV Trucking Corp. ("IEV") is a domestic business corporation organized under the laws of the State of New York, was a broker for the removal and disposal of construction waste from construction sites in the New York City metropolitan area, and arranged for the disposal of construction waste containing hazardous substances by the Opposing Defendants, who transported the waste to the Park.[6] (*Id.* ¶ 14.)

Iglesia De Jesucristo Palabra Miel (the "Church") is a non-profit entity and religious organization. (*Id.* ¶ 15.) Islandia Recycling Inc. is a corporation organized under the laws of the State of New York, and is owned or controlled by Defendant Christopher Grabe. (*Id.* ¶ 16.)

### b. The interrelationship among the Opposing Defendants

Plaintiff claims facts relating to the "interrelationship among the [Opposing] Defendants." (*Id.* at 14.) Plaintiff contends that "Thomas Datre[] Jr. worked with Thomas Datre[] Sr. on construction projects performed by Thomas Datre Sr.'s various businesses." (*Id.* ¶ 49.) Clara Datre testified during her deposition that her son's companies did business with Datre Sr. and Clara's businesses. (*Id.* ¶ 65.) For example, in response to "public work progress" unrelated to the Park, Daytree at Cortland Square submitted a Form of Bid dated October 4, 2012 to the Town and identified Grabe as a "foreman" and Datre Jr. as a project manager for Daytree

---

[5] Opposing Defendants claim that COD only made arrangements with Thomas Datre Jr. and his trucking company. (Defs.' 56.1 ¶ 13.)

[6] Opposing Defendants claim that IEV only made arrangements with Thomas Datre Jr. and his trucking company. (Defs.' 56.1 ¶ 14.)

at Cortland Square.[7]  (*Id.* ¶ 50.)  Clara Datre, as President, signed the Form of Bid.  (*Id.*)
Corporate filings indicate overlap among Datre Sr., Clara Datre, Daytree at Cortland Square, and
Datre Jr. and "his various businesses," including DFF Farm Corp.,[8] (*id.* ¶ 60), but Opposing
Defendants claim that the overlap "was a mistaken filing by the accountant for the [Opposing]
Defendants," (Defs.' 56.1 ¶ 60).  The parties dispute that Daytree at Cortland Square did
business with COD, but the record demonstrates that direct payments were made by COD to
Daytree at Cortland Square between May of 2013 and August of 2014.  (Pl.'s 56.1 ¶ 56; Defs.'
56.1 ¶¶ 35, 56.)

In addition, Plaintiff contends that Daytree at Cortland Square shared offices in a single
lease with Datre Jr. and his businesses at his offices in Ronkonkoma, New York.  (Pl.'s 56.1 ¶¶
51, 63–64.)  Opposing Defendants concede that in late 2012 or early 2013 they moved into the
building that their son had leased but contend that they carved out a separate suite.
(Defs.' 56.1 ¶ 51.)  Further, Daytree at Cortland Square financed vehicles for use by Datre Jr. in
his non-Daytree at Cortland Square related businesses because he could not qualify for financing
on his own.  (Pl.'s 56.1 ¶ 53.)  Daytree at Cortland Square therefore held title to the trucks
operated by Datre Jr. for his businesses.  (*Id.*)  Daytree at Cortland Square and Clara Datre also
provided various loans to Datre Jr. and his businesses between 2010 and 2014.  (*Id.* ¶ 55.)
Between December of 2013 and January of 2014, more than $60,000 were exchanged between
Clara Datre and Datre Jr. or his companies, including DFF Farms.  (*Id.* ¶ 57.)  Clara Datre

---

[7]  Opposing Defendants contend that in 2012, they had only limited experience with tree
removal and "availed themselves" of Datre Jr.'s help to perform some of the Opposing
Defendants' responsibilities under a tree removal contract.  (Defs.' 56.1 ¶ 50.)

[8]  Plaintiff alleges that Datre is an officer or owner of 5 Brothers Farming Corp., Datre
Auto & Equipment Sales Inc., Datre Trucking & Farming Inc. and DFF Farm Corp.  (SAC ¶ 11.)

explained that they considered it a loan if Datre Jr. was short on money and Datre Sr. and Clara or Daytree at Cortland Square covered the shortfall for him.  (*Id.* ¶ 58.)  Daytree at Cortland Square did not charge interest on its loans to Datre Jr., and Datre Jr. repaid the loans by a barter system by providing mechanical services to repair and maintain Daytree at Cortland Square's vehicles.  (*Id.* ¶ 59.)

### c.   The contamination of the Park

The Park is located in Brentwood, New York, and is owned by the Town.  (*Id.* ¶ 3.) Beginning in or around May of 2013, and continuing through on or around May of 2014, 38,000 tons of construction and demolition debris ("C&D"), contaminated fill, and other solid wastes were transported, delivered, and unlawfully disposed of at the Park.  (*Id.*)  Plaintiff contends that each of the named Defendants played a role in the dumping activity, through "gaining or granting access to the Park, conducting the dumping activity, arranging and transporting the materials, concealing the nature of the activity from Town officials, and supplying the materials disposed of at the Park."  (*Id.* ¶ 4.)  Opposing Defendants deny these claims.  (Defs.' 56.1 ¶ 4.)

In or around April of 2013, the Church's representatives reached out to Plaintiff and requested permission to rehabilitate the soccer fields in the northwest quadrant of the Park through placement of topsoil and grass seed on the existing surface.  (Pl.'s 56.1 ¶ 17.)  The Church represented that the rehabilitation would be performed by volunteer members of the Church congregation and users of the field at no cost to the Town.  (*Id.*)  Based on the Church's representations, Joseph Montuori, who was then Commissioner of the Town's Department of Parks, Recreation, and Cultural Affairs, permitted the Church to begin the work in or around May of 2013 at the Church's sole cost and expense.  (*Id.* ¶ 18.)  Montuori granted the permission without a written agreement, schedule, plans and specifications, insurance, performance bond, or

Town board authorization.  (*Id.*)  Opposing Defendants deny having knowledge about these allegations.  (Defs.' 56.1 ¶ 18.)

In or around May of 2013, the Church needed more fill for the project.  (Pl.'s 56.1 ¶ 19.)  A Church representative named William Carillo approached Grabe at a site in Central Islip, where Grabe and the Opposing Defendants were "at the time operating an illegal solid waste disposal facility, using that site to receive waste materials from New York City, and to screen and store fill material that was later determined to contain hazardous substances."  (*Id.*)  Opposing Defendants deny these allegations.  (Defs.' 56.1 ¶ 19.)

Grabe arranged for the delivery of approximately fifty to sixty truckloads of fill material to the Park, at no cost to the Church, in or around late May of 2013.  (Pl.'s 56.1 ¶ 20.)  Datre Jr. made about $450 per truckload.  (*Id.*)  Invoices and business records from Datre Jr.'s companies demonstrate that from August of 2013 through March of 2014, thousands of tons of fill material were delivered to the Park, and the material was dumped and spread over the topsoil and seed previously deposited by Church volunteers in May.  (*Id.* ¶ 21.)  A number of the trucks used to deliver the fill were registered to Datre Sr., Clara Datre, and the corporations they owned and operated.  (*Id.* ¶ 22.)  Opposing Defendants deny these allegations.  (Defs.' 56.1 ¶ 22.)

On November 25, 2013, Town Park Ranger Brendan Kearns observed that approximately seventy piles of "rocky dirt" had been deposited on the soccer field.  (Pl.'s 56.1 ¶ 23.)  The dirt was unscreened and contained large boulders.  (*Id.*)  Kearns interviewed a driver whom Kearns determined to be employed by "Datre."  (*Id.*)  The driver told Kearns that he was told by his boss to drop the fill at the Park.  (*Id.* ¶ 24.)

In mid-January of 2014, Plaintiff began to receive reports from parents and elected officials advising of dangerous conditions for children attempting to sled on the slopes of the

"recharge area" after a snowfall.  (*Id.* ¶ 27.)  Parents reported brick, metal, rebar, and other debris

in the basin.  (*Id.*)  Personnel from the Town confirmed the presence of these materials and

"heavy earth moving equipment" in the basin on January 23 and 24, 2014, and the Park was

closed on that date.  (*Id.*)  On January 24, 2014, Montuori met with other Town officials and

denied knowledge of debris or fill in the basin.  (*Id.* ¶ 28.)  He stated that he would contact the

persons responsible to remove the material.  (*Id.*)  Opposing Defendants contend that Montuori

had knowledge of debris and fill in the Park as early as November or December of 2013, and that

he met with Datre Jr. in January of 2014, during which meeting it was agreed that Datre Jr. and

Grabe, "who were the only parties involved in the dumping," had to clean up the debris from the

recharge basin.  (Defs.' 56.1 ¶ 28.)

Following the January 24, 2014 meeting, the Office of the Town Attorney issued a letter

to the Church and ordered it to cease and desist all work in the recharge area on the south side of

the Park and to immediately remove all fill material deposited in the recharge area.

(Pl.'s 56.1 ¶ 29.)  Although the Town Attorney addressed its order to the Church, the Opposing

Defendants were mobilized at the recharge area to commence removal the same day.  (*Id.* ¶ 30.)

On January 28, 2014, using "Datre trucks," the Opposing Defendants removed over nineteen

truckloads of C&D debris, contaminated fill, and other solid wastes from the recharge area at the

Park.  (*Id.*)  Opposing Defendants admit that the "Datre trucks and one Daytree at Cortland

Square[] truck were used to take material out of the [P]ark, pursuant to the agreement that

Montuori and Torres had with Datre Jr. and Grabe."  (Defs.' 56.1 ¶ 30.)

Surveillance video recorded by the Town on March 24, 2014 by a camera at an entrance

to the Park, as well as still photographs, show at least three separate tractor trailers with a Datre

logo on the driver's side entering the Park.  (Pl.'s 56.1 ¶ 32.)  On March 25, 2014, while opening

the gates to the Park, Kearns observed five "Datre" tractor trailers, which Defendants allege belonged to Datre Jr., waiting on the road outside of the Park.  (*Id.* ¶ 31; Defs.' 56.1 ¶ 31.)  After opening the gates, the trucks entered the Park and proceeded to drop what appeared to be topsoil on the soccer fields.  (Pl.'s 56.1 ¶ 31.)  The soil was being spread on top of existing material that had been delivered previously, which contained large quantities of broken glass, crushed cement, large stones, and clay.  (*Id.*)

On April 9, 2014, Department of Environmental Conservation ("DEC") Officer Jeffrey Hull observed Daytree at Cortland Square employee Oscar Ventura operating a dump truck at the Park.  (*Id.* ¶ 33.)  The dump truck was registered to Daytree at Cortland Square. [9]  (*Id.* ¶ 34.)  Records from IEV, COD, and Opposing Defendants establish that from June of 2013 through 2014, IEV and COD paid over $600,000 to "Datre-related entities DFF Farm Corp, Datre Trucking & Farming Inc., Daytree at Cortland Square, Datre Family Farms Inc., 5 Brothers Farming Corp., . . . for the pickup and removal of materials from different locations in the New York metropolitan area."[10]  (*Id.* ¶ 35.)

According to a statement made to *Newsday* on or about May 25, 2014 by Opposing Defendants' counsel, two trucks owned by Daytree at Cortland Square were seen going to the Park.  (*Id.* ¶ 25.)  Counsel stated that these trucks were used by Datre Jr.'s company, even though

---

[9]  While admitting to Plaintiff's assertions that on April 9, 2014, DEC Officer Hull observed Daytree at Cortland Square employee Oscar Ventura operating a dump truck at the Park and that the dump truck was registered to Daytree at Cortland Square, Opposing Defendants "further specif[y]" that Ventura was operating the vehicle after regular working hours to help Datre Jr. put up a fence and that he did not dump any material at the Park.  (Defs.' 56.1 ¶¶ 33–34.)

[10]  Opposing Defendants admit this statement but specify that COD and IEV "never arranged pickup and removal of materials with the [Opposing] Defendants" and only made arrangements with Datre Jr. and his trucking company."  (Defs.' 56.1 ¶ 35.)

they were titled to Daytree at Cortland Square for "security purposes." (*Id.*)  The article made it clear that the Town intended to hold liable those responsible for the dumping. (*Id.* ¶ 26.)  According to the article, Opposing Defendants' counsel added that he planned to file a federal complaint against the Town that week, which he did. (*Id.*)

### d.   Criminal proceedings involving the Park

In April of 2014, the Suffolk County District Attorney's Office (the "SCDA") commenced a criminal investigation into the unlawful disposal of fill at the Park and other locations within Suffolk County, based on the Town's receipt of a Grand Jury Subpoena from the SCDA dated April 21, 2014 regarding "improvements" made at the Park. (Pl.'s 56.1 ¶ 36; *see also* Grand Jury Subpoena dated April 21, 2014, annexed to Pl.'s Mot as Ex. 25, Docket Entry No. 307-27).)

On or about December 8, 2014, a Suffolk County grand jury returned indictments charging 5 Brothers Farming Corp., Daytree at Cortland Square, Datre Family Farms, Inc., DFF Farms Corporation, Thomas Datre Jr., Thomas Datre Sr., and Grabe with "a variety of criminal offenses." (Pl.'s 56.1 ¶ 37.)  The grand jury charged Daytree at Cortland Square, among other criminal defendants, with twenty-seven different crimes, (*id.* ¶ 38); Thomas Datre Jr. with twenty-nine different crimes, (*id.* ¶ 39); Datre Family Farms, Inc. with eleven different crimes, (*id.* ¶ 40); and Thomas Datre Sr. with five crimes, (*id.* ¶ 41).

After the criminal trial commenced, Thomas Datre Jr. pleaded guilty to multiple counts of Endangering the Public Health, Safety or Environment, all Class E Felonies, and four Class A Misdemeanor counts in connection with dumping debris at four sites, including the Park. (*Id.* ¶ 43.)  He was sentenced to one year in jail. (*Id.*)  Grabe pleaded guilty to two felonies in connection with his role in the dumping scheme, and was sentenced to thirty days in jail, five

months of community service, and five years of probation.  (*Id.* ¶ 45.)  Daytree at Cortland

Square entered a guilty plea to a charge of willful failure to pay prevailing wages to workers in a

contract unrelated to the dumping at the Park.  (*Id.* ¶ 44.)  All other criminal charges related to

the dumping at the Park were dismissed.  (Decl. of Andrew Campanelli ¶ 13, annexed to Defs.'

Opp'n, Docket Entry No. 309.)

### e.  Remediation efforts

After the dumping was discovered, Plaintiff engaged in extensive remediation efforts

pursuant to a Revised Material Removal Work Plan (the "Plan") approved by the New York

State DEC on January 13, 2015.  (Pl.'s 56.1 ¶ 5.)  By entering into the Plan, which cost Plaintiff

almost $4,000,000 in taxpayer funds with possible costs in the future, Plaintiff resolved its

liability to the State of New York for the contamination of the Park by way of an administrative

settlement.  (*Id.* at ¶ 6.)  Opposing Defendants deny having knowledge or information about this

statement.  (Defs.' 56.1 ¶¶ 5–6.)

### f.  Federal action commenced by New York State

On May 4, 2017, the State of New York commenced a lawsuit in the Eastern District of

New York captioned *Seggos v. Thomas Datre Jr., et al.*, 17-CV-2684, in connection with the

contamination of the Park, alleging violations of CERCLA and New York State law.  (Pl.'s 56.1

¶ 46.)  In addition to Datre Jr., the State of New York named several defendants, including

Grabe, 5 Brothers Farming Corp., and Daytree at Cortland Square.  (*Id.*)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

11

*Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021); *United States v. Bedi*, 15 F.4th 222, 225 (2d Cir. 2021).  The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.* at 252.  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**b.   First, second, and third counterclaims**

Plaintiff argues that it is entitled to summary judgment dismissing the Opposing Defendants' first three counterclaims, which allege that by commencing and prosecuting this action, Plaintiff is liable under section 1983 for violating Defendants' First and Fourteenth Amendment rights, because there is no evidence to suggest that this action is anything but a "good[-]faith attempt to seek compensation for damages" and Plaintiff is therefore protected by the *Noerr-Pennington* doctrine.  (Pl.'s Mem. 3–6.)

Opposing Defendants argue that Plaintiff is not entitled to summary judgment dismissing their first, second, and third counterclaims, because its action against the Opposing Defendants is a "sham," and *Noerr-Pennington* immunity is therefore unavailable to Plaintiff.  (Defs.' Opp'n 14–16.)

The *Noerr-Pennington* doctrine has historically been used to "immunize[] parties from antitrust liability for injuries resulting from government action prompted by the parties' [First Amendment] petitioning activities."  *Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 217 (2d Cir. 2006), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013); *see United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *see also Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 233 (2d Cir. 2004) ("*Noerr-Pennington* immunity is a First Amendment-based doctrine that protects private parties from liability under the Sherman Act in connection with efforts to petition for anticompetitive legislation.").

Although this doctrine "was first established in the context of concerted petitions for anti-competitive legislation," *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 99 (2d Cir. 2000), because the doctrine is essentially "an application of the [F]irst [A]mendment," *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 100–02 (2d Cir. 1983), courts routinely extend its application to a wide range of civil actions under both state and federal law.  *See, e.g.*, *Hirschfeld v. Spanakos*, 104 F.3d 16, 19–20 (2d Cir. 1997) (applying *Noerr-Pennington* to

section 1983 action); *In Re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 14-CV-6228, 2021 WL 3371938, at *22 (S.D.N.Y. Aug. 3, 2021) (collecting cases across federal district and circuit courts applying doctrine to claims of violations of federal and state law claims); *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 693 (S.D.N.Y. 2019) ("[C]ourts have expanded [the doctrine] to protect First Amendment petitioning of the government from claims brought under [f]ederal and [s]tate law, including claims pursuant to [section 1983]." (first two alterations in original) (quoting *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 707 N.Y.S.2d 647, 652 (2000))); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 593–604 (S.D.N.Y. 2010) ("[T]he Court is persuaded that government actors are afforded some measure of protection under the *Noerr-Pennington* doctrine and First Amendment to petition when they lawfully do so . . . in their representative capacity [such as bringing litigation that is not a sham].") (applying *Noerr-Pennington* where religious corporations and individuals brought religious discrimination action against villages and village officials alleging violations of and conspiracy to violate their rights under First and Fourteenth Amendments), *aff'd sub. nom. Bernstein v. Vill. of Wesley Hills*, 644 F. App'x 42 (2d Cir. 2016); *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 343, 364 (S.D.N.Y. 2010) (applying *Noerr-Pennington* in the civil rights context to Article 78 proceedings and relying on *Mosdos*, 701 F. Supp. 2d at 593–604). "The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of a prior court proceeding." *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002).

The doctrine does not apply, however, where there has been a "sham" suit, i.e., where a lawsuit is so utterly devoid of merit as to qualify as "objectively baseless." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993); *see Ginx, Inc.*, 720 F. Supp.

14

2d at 363 ("Under this doctrine — first developed in the context of antitrust litigation, where it is known as the *Noerr-Pennington* doctrine, and later extended to other areas of law — a party's right to file a lawsuit without liability is unimpeachable unless the suit is a 'sham,' meaning 'objectively baseless.'" (quoting *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60)); *Mosdos*, 701 F. Supp. 2d at 596 ("[T]he Supreme Court sought to protect conduct that falls within the ambit of the First Amendment right to petition, 'regardless of intent or purpose' behind that conduct, so long as that conduct does not constitute sham activity." (quoting *Pennington*, 381 U.S. at 670)). A lawsuit falls within the "sham exception" to *Noerr–Pennington* where "the litigation is (1) 'objectively baseless' and (2) intended to cause harm to the defendant 'through the use [of] governmental process — as opposed to the outcome of that process.'" *T.F.T.F. Capital Corp.*, 312 F.3d at 93 (alteration in original) (quoting *Prof'l Real Estate Investors*, 508 U.S. at 60–61).

The Court finds that Plaintiff is protected by the *Noerr-Pennington* doctrine because based on the record before the Court, no reasonable jury could find that Plaintiff's claims constitute "sham litigation," (Defs.' Mem. 15 (quoting *Mosdos*, 701 F. Supp. 2d at 597)).[11] There is no evidence either that the lawsuit is "objectively baseless" or that Plaintiff "intended to cause harm to [Opposing Defendants] through the use [of] governmental process." *T.F.T.F. Capital Corp.*, 312 F.3d at 93 (alteration in original) (internal quotations omitted). Rather,

---

[11] The fact that the prosecution in the criminal case against Opposing Defendants and others "relied on the very same evidence and legal arguments cited by" Plaintiff, (Defs.' Mem. 12), and the prosecution ultimately dismissed those charges against Opposing Defendants, does not bear upon the Court's analysis, as the standard of proof in this action is different from that in a criminal case, the causes of action against Opposing Defendants are different than in the prior criminal case, and the criminal proceedings have no bearing on the question of whether the Town's civil action was initially brought as a sham. Moreover, the protections of the First Amendment right to petition do not "hinge on whether the lawsuit is successful, but rather on whether it is reasonably based and appropriately motivated." *Mosdos*, 701 F. Supp. 2d at 597–98 (citing *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 531–32 (2002)).

Plaintiff had an objectively reasonable reason to commence litigation against Opposing Defendants. Following the January 24, 2014 meeting, the Office of the Town Attorney issued a letter to the Church and ordered it to cease and desist all work in the recharge area on the south side of the Park and to immediately remove all fill material deposited in the recharge area. (Pl.'s 56.1 ¶ 29.) Opposing Defendants were mobilized at the recharge area to commence removal on January 24, 2014, and Datre trucks and one Daytree at Cortland Square truck were used to take material out of the Park. (*Id.* ¶ 30; Defs.' 56.1 ¶ 30.) Further, at least one employee of Daytree at Cortland Square was seen at the Park on April 9, 2014, as investigating DEC Officer Jeffrey Hull testified, although Opposing Defendants later claimed that he was working afterhours in assisting Datre Jr. on an unrelated matter. (Dep. Tr. of Jeffrey Hull ("Hull Dep.") 14:1–18:25, annexed to Pl.'s Mot. as Ex. 23, Docket Entry No. 307-25; Defs.' 56.1 ¶ 33.) There were also several trucks at the Park that day, one labeled "Datre," and another labeled "Daytree," both registered to Daytree at Cortland Square, one of the Opposing Defendants. (Hull Dep. at 18:5–22; Pl.'s 56.1 ¶¶ 33–34.) In addition, there is evidence demonstrating payment from COD, another party named as a Defendant, to Daytree at Cortland Square during the periods when the dumping took place at the park in 2013 and 2014, (*see* COD Checks to Daytree at Cortland Square, annexed to Pl.'s Mot. as Exs. 24 and 29, Docket Entry Nos. 307-26 and 307-31).

Further, while Opposing Defendants assert that Datre Jr. was responsible for the "toxic dumping scandal at the Park," (*see, e.g.*, Defs.' Mem. 1, 5–6), Clara Datre referred to Daytree at Cortland Square as a "family business" to explain why her son was listed as a general manager despite not being "employed" by the company. (Dep. Tr. of Clara Datre ("Clara Datre Dep. I") 72:22–73:7, annexed to Pl.'s Mot. as Ex. 32, Docket Entry No. 307-34.) She admitted that if Datre Jr. was "short in his account," she would transfer money to him and he would pay her

back, since they were "a family business." (*Id.* at 87:3–6.)  Opposing Defendants do not contest

that Clara Datre and Datre Sr. did not charge interest on any loans to Datre Jr., and that loans

were repaid via a barter system where he would provide mechanical services.  (Defs.' 56.1 ¶ 59.)

Thus, even if Datre Jr. was "not employed by [Opposing Defendants], . . . he was giving [them]

his services." (Clara Datre Dep. I. 73:5–7.)  In addition, Opposing Defendants do not contest

that when Datre Jr. was short on money, Datre Sr. and Clara Datre or Daytree at Cortland Square

would cover the shortfall, or that over a one-month period, from December of 2013 through

January of 2014, part of the same time period when the dumping took place, more than $60,000

were exchanged between Clara Datre and Datre Jr. or his companies, including DFF Farms Inc.

(Pl.'s 56.1 ¶¶ 57–58.)  Nor do they contest that there was "one lease for the three units" in the

building where they had their offices, which were shared by Datre Jr.'s businesses and the

Opposing Defendants.  (Dep. Tr. of Clara Datre ("Clara Datre Dep. II") 32:16–20, annexed to

Pl.'s Mot. as Ex. 9, Docket Entry No. 307-11.)  The New York State Department of State filings

also show that Datre Jr.'s companies and Opposing Defendants shared common space.  (NYS

Dep't of State Corporate Filings, annexed to Pl.'s Mot. as Ex. 31, Docket Entry No. 307-33.)

       Finally, as Plaintiff notes, CERCLA liability is "considerably broad[]," (Pl.'s Reply 2),

which bolsters Plaintiff's decision to sue Opposing Defendants.  The statute is designed to

"promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such

cleanup efforts [a]re borne by those responsible for the contamination." *Burlington N. & Santa*

*Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quoting *Consol. Edison Co. of N.Y., Inc.*

*v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)); *see also MPM Silicones, LLC v. Union*

*Carbide Corp.* (*MPM Silicones II*), 966 F.3d 200, 228 (2d Cir. 2020), *as amended* (Aug. 13,

2020) (noting that "CERCLA's manifest purpose [is] to 'encourag[e] the timely cleanup of

hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition'" (second alteration in original) (quoting *Consol. Edison Co. of N.Y., Inc.*, 423 F.3d at 94)).  The statute "imposes strict liability on facility owners and operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site, often collectively referred to as [PRPs]."  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).  As a result of this broad and strict liability, Plaintiff had objectively and subjectively reasonable bases for bringing suit against Opposing Defendants.

Accordingly, the Court finds that *Noerr-Pennington* immunity applies, and dismisses Opposing Defendants' first, second, and third counterclaims against Plaintiff.

### c.   Fourth and fifth counterclaims

Plaintiff argues that because Opposing Defendants cannot prove the Town is liable under section 1983 for violating their First or Fourteenth Amendment rights, it is entitled to summary judgment dismissing their fourth and fifth counterclaims, which allege conspiracy under section 1983.  (Pl.'s Mem. 6)  In addition, Plaintiff argues that even if those claims have merit, they nevertheless fail because Opposing Defendants fail to name as counterclaim defendants any of the Town's alleged co-conspirators, and the intracorporate doctrine prevents the Town's supervisor and its attorneys from being able to conspire.  (*Id.*)

Opposing Defendants argue that they have "put forth sufficient evidence to show" that Plaintiff, the Town's supervisor Angie Carpenter, and Plaintiff's attorneys were involved in a conspiracy.  (Defs.' Mem. 17–18.)  They also contend that the intracorporate doctrine does not apply because the conspiracy involved Plaintiff as a state actor and Plaintiff's attorneys as private actors.  (*Id.* at 18.)

To state a claim for conspiracy under section 1983, a "plaintiff must plausibly allege (1) an agreement between a state actor and a private party (2) to act in concert to inflict unconstitutional injury, and (3) an overt act furthering that goal and causing damages." *Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)); *see also McCray v. Patrolman N.A. Caparco*, 761 F. App'x 27, 31 (2d Cir. 2019) (same); *McGee v. Dunn*, 672 F. App'x 115, 116 (2d Cir. 2017) (same); *Zavalidroga v. Cote*, 395 F. App'x 737, 740 (2d Cir. 2010) ("Although private actors are liable under [s]ection 1983 if they conspired with state officials, to state a claim based on 'a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.'" (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.1992))).  "[E]ven specific allegations of conspiracy, if conclusory, [are] not . . . sufficient to state a claim for conspiratorial violation of [a plaintiff's] rights." *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014).  However, because "'conspiracies are by their very nature secretive operations,' [they] may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)); *see also Anilao v. Spota*, 340 F. Supp. 3d 224, 255 (E.D.N.Y. 2018) (quoting same).

"[U]nder the intracorporate conspiracy doctrine, the 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'" *Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015) (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)) (barring the plaintiff's conspiracy claims under the intracorporate conspiracy doctrine because "the defendants were employees or agents of Stamford, the alleged conspiratorial activities pertained to and were motivated by the defendants' respective public

duties, and all of the alleged discriminatory conduct pertains to a single act (the wrongful property assessment)"); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (noting legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation).  An exception to the intracorporate conspiracy doctrine exists where the individuals are "motivated by an independent personal stake in achieving the corporation's objective."  *Salgado v. City of New York*, No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting *Girard v. 94th St. and Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976)); *see also Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (quoting *Salgado*, 2001 WL 290051, at *8).

Because as discussed above, Opposing Defendants' section 1983 counterclaims under the First and Fourteenth Amendments fail, accordingly, the conspiracy counterclaims fail as well. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (ruling that a section 1983 conspiracy claim fails where there is no underlying constitutional violation).  Even assuming these counterclaims could proceed, they nevertheless fail because there is no evidence that this action was a "malicious scare tactic to dissuade [Opposing Defendants] from pursuing their meritorious claims against Plaintiff."  (Defs.' Mem. 17.)  The fact that Plaintiff's arguments in this case are the same as those made unsuccessfully in the criminal proceedings lend no support to Opposing Defendants' arguments.

Moreover, Carpenter is the Town's supervisor and is therefore a part of the Town, barring any co-conspirator claims.  *See Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (explaining that under the intracorporate conspiracy doctrine, "employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together" (citing *Hill v. City of New York*, No. 03-CV-1283, 2005 WL 3591719, at *6 (E.D.N.Y.

Dec. 30, 2005))); *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 62 (E.D.N.Y. 2010) ("The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."); *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 246–48 (E.D.N.Y. 2009) (barring claims under doctrine where defendants were "all employees of a single municipal entity," in this case a village).  Further, Opposing Defendants do not contend that Carpenter was motivated by an independent personal stake in achieving the Town's objective, which would provide an exception to the intracorporate conspiracy doctrine. *Salgado*, 2001 WL 290051, at *8 (finding an exception to the intracorporate conspiracy doctrine where individuals are "motivated by an independent personal stake in achieving the corporation's objective").

Nor does naming Plaintiff's counsel save the conspiracy claims, as counsel is considered an agent of Plaintiff.  *See Urli v. Town of Hempstead Sanitary Dist. No. 7.*, No. 20-CV-0960, 2021 WL 4311141, at *6 (E.D.N.Y. Sept. 22, 2021) ("Even though [counsel] was not a member of the [b]oard, the intra-corporate conspiracy doctrine still applies because as an attorney he acted as an agent of the [defendant]."); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 150 (2d Cir. 2016) ("As a general matter, a client-principal is 'bound by the acts of his lawyer-agent.' This rule rests upon 'well-settled principles of agency law.'" (citations omitted) (first quoting *Link v. Wabash R,R. Co.*, 370 U.S. 626, 634 (1962); and then quoting *Maples v. Thomas*, 565 U.S. 266, 280–81 (2012))).  In addition, they have not demonstrated that Plaintiff's counsel was "motivated by an independent personal stake in achieving the corporation's objective." *Salgado*, 2001 WL 290051, at *8.

Accordingly, because there is no underlying constitutional violation, preventing a finding

of conspiracy, and because the intracorporate conspiracy doctrine would bar Opposing

Defendants' section 1983 conspiracy counterclaims, the Court dismisses Opposing Defendants'

fourth and fifth counterclaims.

### d. Sixth and seventh counterclaims

Opposing Defendants seek indemnification or contribution from Plaintiff on the basis of

negligence and negligent supervision.  (SAA ¶¶ 381–418.)

Plaintiff argues that Opposing Defendants' sixth and seventh counterclaims seeking

common law indemnification or contribution from Plaintiff for any liability incurred as a result

of the CERCLA claims should be dismissed, because they are barred by 42 U.S.C. § 9613(f)(2),

which provides that where a person has "resolved its liability to the United States or a State in an

administrative or judicially approved settlement," the person shall "not be liable for claims for

contribution regarding matters addressed in the settlement."  (Pl.'s Mem. 7–8 (quoting 42 U.S.C.

§ 9613(f)(2)).)  As to the non-CERCLA claims against Opposing Defendants, Plaintiff argues

that these counterclaims must be dismissed because all other co-Defendants have already

defaulted or settled, and therefore there is no relief available.  (Pl.'s Reply 7)

Opposing Defendants argue that because 42 U.S.C. § 9613(f)(2) applies only to

CERCLA claims and Plaintiff has filed RICO, negligence, public nuisance, private nuisance,

injury to property, joint tortfeasor, and restitution claims against them, these counterclaims

should not be dismissed, as they would be entitled to indemnification and/or contribution from

Plaintiff "with respect to any judgment which may be entered against them or recovered against

them by any co-defendant" for any non-CERCLA claims.  (Defs.' Mem. 18–19.)

### i. CERCLA claims

Plaintiff is not liable to Opposing Defendants for contribution or indemnification under

CERCLA.

"Among other measures, CERCLA 'authoriz[es] private parties to pursue contribution or indemnification from potentially responsible parties ["PRPs"] for expenses incurred responding to environmental threats.'" *MPM Silicones II*, 966 F.3d at 214 (first alteration in original) (quoting *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000)); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) ("CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups."). Section 113 provides PRPs who have been sued under section 107 with a right of contribution from other PRPs and also provides a right of contribution to PRPs that have settled their CERCLA liability with a state or the United States through either an administrative or judicially approved settlement. *See Niagara Mohawk Power Corp.*, 596 F.3d at 121 (citing 42 U.S.C. § 9613(f)(3)(B), (f)(1)). "[A] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." *Territory of Guam v. United States*, 141 S. Ct. 1608, 1612 (2021) (quoting 42 U.S.C. § 9613(f)(2)); *see Niagara Mohawk Power Corp.*, 596 F.3d at 126 (ruling that consent order between party and the DEC resolved party's liability "for purposes of contribution protection"); *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 676 (S.D.N.Y. 2015) (stating that party that resolved its liability with the DEC through settlement was "entitled to the full extent of protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA").

Opposing Defendants do not appear to contest that this statute bars any indemnification or contribution for Plaintiff's CERCLA claim. (*See* Defs.' Mem. 18–19; Pl.'s Reply 7 ("The

[Opposing] Defendants do not dispute that, as to the Town's CERCLA claims, their sixth and seventh counterclaims . . . are barred.").)  Accordingly, Plaintiff is not liable for contribution and/or indemnification under CERCLA.

### ii.   State law and RICO claims

As for Plaintiff's other claims, Plaintiff cannot contribute or indemnify Opposing Defendants "with respect to any judgment which may be entered against them or recovered against them by any co-defendant," as Opposing Defendants have demanded.  (Defs.' Mem. 18–19.)  Plaintiff correctly notes that all of Opposing Defendants' co-Defendants have either defaulted or were dismissed from this case through consent decrees.[12]  (Pl.'s Reply 7.)  As a result, "[Opposing] Defendants do not have any exposure to any of their co-[D]efendants."  (*Id.*)  Opposing Defendants also cannot "seek contribution or common-law indemnification" from Plaintiff itself from any judgment entered against them, because an alleged tortfeasor may not seek contribution or indemnification from the claimant.  *Capstone Enters. of Port Chester, Inc. v. Bd. of Educ. Irvington Union Free Sch. Dist.*, 966 N.Y.S.2d 138, 142–43 (2013) ("In addition, as between a claimant and an alleged tortfeasor, although the alleged tortfeasor may assert the claimant's own culpable conduct . . . , in the absence of a direct tort claim against it by another party, the alleged tortfeasor may not properly seek contribution . . . or common-law indemnification from the claimant, whether by means of a counterclaim or otherwise, since the relief sought by the tortfeasor does not constitute an independent cause of action.").[13]

---

[12]  John Doe Nos. 1 through 10 have not been identified, and have not appeared or moved in this action.

[13]  Plaintiff also argues that Opposing Defendants' counterclaims for indemnification and contribution under state causes of action should be dismissed under section 9613 of CERCLA, relying on *Crown Cork & Seal Co. v. Dockery*, 907 F. Supp. 147, 151 (M.D.N.C. 1995) (holding

Accordingly, the Court grants Plaintiff's motion and dismisses Defendants' sixth and seventh counterclaims.

**III. Conclusion**

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment and dismisses Opposing Defendants' first, second, and third counterclaims for First Amendment retaliation under 42 U.S.C. § 1983 and Fourteenth Amendment substantive due process and procedural due process violations under 42 U.S.C. § 1983; fourth and fifth counterclaims for conspiracy to violate the First Amendment and the Fourteenth Amendment under 42 U.S.C. § 1983; and sixth and seventh counterclaims for indemnification/contribution.

Dated:  February 14, 2022
        Brooklyn, New York

                          SO ORDERED:


                          ____s/ MKB_____
                          MARGO K. BRODIE
                          United States District Judge

---

that section 9613 applies to claims of indemnification or contribution under both CERCLA and the common law and dismissing counterclaims accordingly).  (Pl.'s Reply 7.)  Because the Court decides the motion on other grounds, it declines to address this argument.