UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
TOWN OF ISLIP,

                        Plaintiff,

                                                          **MEMORANDUM
          v.                                              AND ORDER**
                                                          16-CV-2156-SJB

THOMAS DATRE, SR., CLARA DATRE, and
DAYTREE AT CORTLAND SQUARE, INC.,

                        Defendants.
-----------------------------------------------------------------------X
**BULSARA, United States District Judge:**

          In this action spanning nearly a decade, the Town of Islip (the "Town") has

sought to hold Thomas Datre, Sr. ("Datre Sr."), Clara Datre, and two corporations—

Daytree at Cortland Square, Inc. ("Cortland") and Daytree Customer Builders Inc.—

liable for contamination at Roberto Clemente Park (the "Park"). (Second Am. Compl.

dated May 24, 2019 ("Second Am. Compl."), Dkt. No. 173 ¶ 1). After years of litigation

the case went to trial on March 31, 2025, for alleged violations of the Comprehensive

Environmental Response Compensation and Liability Act ("CERCLA"), negligence, and

public nuisance. (*See* Proposed Joint Pretrial Order dated Mar. 7, 2025 ("JPTO"), Dkt.

No. 345 at 3–4; Minute Entry dated Mar. 31, 2025).

          At trial, before the case was submitted to the jury, the defendants moved for

judgment as a matter of law, a request that was granted in part and denied in part.

(Defs.' First Mot. for J. as a Matter of Law filed Apr. 1, 2025 ("Defs.' First JMOL Mot."),

Dkt. No. 356; Minute Entry dated Apr. 2, 2025). All claims against Daytree Custom

Builders Inc., and the CERCLA and negligence claims against the other three defendants, were dismissed with prejudice. (Minute Entry dated Apr. 2, 2025). The jury was asked to resolve the single remaining claim for public nuisance against the three remaining defendants (hereinafter "Defendants"), and it returned a verdict finding each liable for negligently creating a public nuisance. (Special Verdict Sheet dated Apr. 2, 2025 ("Verdict Sheet"), Dkt. No. 360; Minute Entry dated Apr. 2, 2025). Following the jury's verdict, Defendants renewed their motion for judgment as a matter of law, and now ask the Court to enter a verdict in their favor. (Defs.' Renewed Mot. for J. as a Matter of Law dated Apr. 17, 2025 ("Defs.' Second JMOL Mot."), Dkt. Nos. 364). For the reasons explained below, Defendants' motion is denied.

## FACTS

The following summary of the relevant evidence is drawn from the evidence presented to the jury.

The Park is a 30-acre park located in Brentwood and owned by the Town. (Stipulation of Facts filed Apr. 1, 2025 ("Stipulation of Facts"), Dkt. No. 355 ¶ 1; Trial Testimony of Brendan Kearns dated Mar. 31, 2025 ("Trial Tr. (Kearns)"), Dkt. No. 374 at 19:12–13). What first began as a voluntary rehabilitation of the Park's soccer fields, led by a church—Iglesia De Jesucristo Palabra Miel (the "Church")—turned the Park into a dumping ground: from May 2013 through May 2014, 38,000 tons of waste material was illegally deposited there. (Stipulation of Facts ¶¶ 2, 15, 17).

The Church first offered to place topsoil and grass seed over the existing soccer field. (*Id.* ¶ 17). The waste dumping began after Christopher Grabe offered to deliver

2

"fill" to the Park at no cost to the Church.  (*Id.* ¶¶ 13–14, 16–23).  Two brokers—COD Services Corp. ("COD") and IEV Trucking Corp. ("IEV")—were in the business of removing waste from construction sites in New York for disposal.  (*Id.* ¶¶ 13–14).[1] Grabe, IEV, and COD worked with Thomas Datre Jr. ("Datre Jr."), (*id.* ¶ 18), the son of defendants Datre Sr. and Clara Datre, (*id.* ¶ 36), on such waste removal.  (Stipulation of Facts ¶ 28; Trial Testimony of Datre Jr. dated Apr. 1, 2025 ("Trial Tr. (Datre Jr.)"), Dkt. No. 375 at 285:1–12).  Some of this construction waste ended upon in the Park: Grabe arranged for delivery of 50–60 loads of fill there, with Datre Jr. receiving $ 450 per truckload.  (Stipulation of Facts ¶ 18).  Invoices and business records from Datre Jr.'s companies show that thousands of tons of fill material were dumped in the Park, from August 2013 through March 2014, including over the topsoil and seed previously deposited by Church volunteers.  (Stipulation of Facts ¶¶ 19, 31).

In September 2013, while on routine patrol at the Park—near one of its soccer fields—Ranger Brendan Kearns observed that the topsoil was covered with dirt and hazardous waste: "a mixture of glass, brick, rebar, metal bands, ceramic tile, and asbestos shingles."  (Trial Tr. (Kearns) at 18:21–22, 21:6–22).  Then on November 25, 2013, he observed 70 piles of "unscreened" dirt containing large boulders deposited on the soccer fields, (*id.* at 26:23–27:7; Stipulation of Facts ¶ 20; Town of Islip Public Safety record dated Nov. 21, 2013, Pl.'s Ex. 1).  Kearns spoke with a driver of one truck which he saw, who indicated he was from "Datre."  (Stipulation of Facts ¶ 20; Trial Tr. (Kearns) at 27:7–8, 42:6–8 ("He told me that he was from Datre, that this stuff was

---

[1] Both COD and IEV reached settlements with the Town.  (JPTO at 2 n.1).

coming from Nassau County.")).  With one exception, Kearns did not know whether the Datre trucks were from Cortland, or a different Datre corporate entity, or who specifically directed the driver to dump these materials.  (Trial Tr. (Kearns) at 43:19–22, 50:3, 50:10–11).  Kearns was able to trace the registration of one truck to Cortland.  (*Id.* at 63:22–64:12).

Then, on March 25, 2014, Kearns observed five tractor-trailers bearing the name "Datre" depositing soil on top of the glass, cement, stones, and clay.  (Stipulation of Facts ¶ 24).  Surveillance video confirmed that at least three tractor-trailers with a "Datre" logo were on Park grounds on that day.  (*Id.* ¶ 25).  In other words, soil was placed onto top of the previously deposited construction waste at the soccer fields; this waste was not removed until the Town conducted remediation.  (Trial Tr. (Kearns) at 47:25–48:1).

In a separate incident of dumping, in January 2014, the Town received reports from parents that there was "brick, metal, rebar, and other debris" in an area other than the soccer fields, namely the "lower discharge" area, where children played.  (Stipulation of Facts ¶ 21; *see* Town of Islip Public Safety Record dated Jan. 25, 2014, Pl.'s Ex. 4; Trial Tr. (Kearns) at 66:21–24 ("There's two separate occasions.  There's two separate things.  There's dumping on the soccer field . . . and then there's dumping in the [discharge area][.]")).[2]  The Town entered into an agreement with Grabe and Datre Sr. to remove this material from the "lower discharge" area in the following months.

_____

[2] "[T]o the far south end you had you may know it as a sump.  It's a sump.  They call it a discharge basin.  And that was . . . very high and so kids could sleigh ride and it goes down to about a acre platform on the bottom."  (Trial Tr. (Kearns) at 31:20–25).

(Stipulation of Facts ¶ 23).  A truck from Cortland was used in the cleanup efforts.  (*Id.* ¶ 23).[3]

In April 2014, the Suffolk County District Attorney's Office commenced a criminal investigation.  (Stipulation of Facts ¶ 29).  Datre Jr. pled guilty to multiple felonies related to dumping materials in the Park.  (Trial Tr. (Datre Jr.) at 343:14–344:1).[4] Defendants denied any role in the dumping, claiming that Datre Jr. did the dumping without their knowledge or participation.  Clara Datre testified that she only found out about the dumping after the fact, as did Datre Sr.  (Trial Testimony of Clara Datre dated Mar. 31, 2025, to Apr. 1, 2025 ("Trial Tr. (Clara Datre)"), Dkt. Nos. 374–75 at 102:22–25, 133:10–13; Trial Testimony of Datre. Sr. dated Apr. 1, 2025 ("Trial Tr. (Datre Sr.)"), Dkt. No. 375 at 249:14–18).  Datre Jr. also testified that his parents had no knowledge or involvement in the dumping at the Park or his business activities (Trial Tr. (Datre Jr.) at 287:3–5, 301:5–24, 310:17–23).  During his testimony, he also denied personally doing anything illegal in the Park—despite having pled guilty to felonies related to waste

---

[3]  Cortland had a separate contract for tree trimming and removal with the Town, (Trial Tr. (Kearns) at 69:09–16), but Clara Datre testified that the contract never involved any work at the Park.  (Trial Tr. (Clara Datre) at 95:1–14, 95:18–21).

[4]  Datre Jr. pled guilty to four felony counts of Endangering the Public Health, Safety or Environment and four Misdemeanor counts, and was sentenced to one year in jail.  (Pl.'s Mot. for Summ. J. Rule 56.1 Stmt. dated June 4, 2021 ("Pl.'s 56.1."), Dkt. No. 307-1 ¶ 43; Second Am. Compl. ¶ 58); *see also Town of Islip v. Datre*, No. 16-CV-2156, 2022 WL 445680, at *5 (E.D.N.Y. Feb. 14, 2022).  Those charges were for reckless disposal of hazardous waste at the Park and other locations in Suffolk County without a permit.  (Pl.'s 56.1 ¶ 43; Second Am. Compl. ¶ 58).  Grabe separately pled guilty to two felonies; but all other criminal charges related to the dumping against other defendants were dismissed.  (Pl.'s 56.1 ¶ 45); *Town of Islip*, 2022 WL 445680, at *5.  These details were not presented to the jury.

dumping.  (*Id.* at 344:7–12).  And he claimed that nothing he did was wrong.  (*Id.* at 338:9–16).

The Town contended that Defendants were participants in a scheme to dispose illegally of the waste materials.  (*E.g.*, Trial Tr. of Opening Statements dated Mar. 31, 2025 ("Trial Tr. (Openings)"), Dkt. No. 374 at 10:14–12:14, 13:20–22, 16:5–8; Trial Tr. of Closing Statements dated Apr. 2, 2025 ("Trial Tr. (Closings)"), Dkt. No. 376 at 452:14–22, 463:1–464:8).  The evidence ultimately showed an interrelated web — of money, ownership, projects, control, and locations — between the three Defendants on the one hand (Cortland, Clara Datre, and Datre Sr.) and Datre Jr. and the companies he owned and operated on the other.

With respect to Datre Jr.'s own companies, of which there were several, (*see* Trial Tr. (Datre Jr.) at 334:21–24), Datre Sr. and Clara Datre claimed that his companies were separate; yet they admitted the entities were all part of a single family business.  (Trial Tr. (Clara Datre) at 221:21–222:4 ("[T]here was Tom and I . . . and Tommy had his businesses.. . . [H]ere and there he might make a suggestion . . . but it was like one big family."); Stipulation of Facts ¶ 48 ("Thomas Datre, Jr.'s companies did business with Thomas Datre, Sr. and Clara Datre's businesses, emphasizing that '[a]gain, we were a family business.'")).  The relationship between Datre Jr. and his companies, and Clara Datre, was "very informal" in terms of how they did things.  (Trial Tr. (Clara Datre) at 160:3–6).  Datre Sr. acknowledged giving his son resources, including trucks and money, whenever he needed them.  (Trial Tr. (Datre Sr.) at 269:16–270:4).  But Datre Jr.'s

parents claimed to have no involvement in the day-to-day operations of his trucking and waste removal business.  (*Id.* at 248:8–20).

Datre Sr., Clara Datre, and Datre Jr. all had office space in the same corporate building in Ronkokoma.  (Stipulation of Facts ¶ 36).  Clara Datre testified that her son's company was next door to hers, with separate entrances and telephone numbers.  (Trial Tr. (Clara Datre) at 97:19–98:15).  Cortland paid rent on behalf of all businesses operated by Datre Jr. at the Ronkokoma office, for which there was a single lease covering both Defendants' and Datre Jr.'s businesses.  (*Id.* at 201:22–24; Stipulation of Facts ¶¶ 46–47).  Datre Jr. and his businesses shared the same parking lot space with Defendants; and Datre Jr. would use the trucks registered to the Defendants for his own business activities.  (Trial Tr. (Clara Datre) at 107:21–108:3; Trial Tr. (Datre Sr.) at 271:18–272:2).

Clara Datre provided loans to her son and his businesses between 2010 and 2014; over $ 60,000 was exchanged between Clara Datre and Datre Jr. in a one-month period alone, from December 2013 through January 2014.  (Stipulation of Facts ¶¶ 37–38).  When these loans were provided by Cortland to Datre Jr., he was not charged interest, but would "repay" the loans through a "barter system" by servicing Cortland's vehicles.  (*Id.* ¶ 40).  Clara Datre and Datre Sr. frequently provided money, via personal checks or checks from Cortland, to support his businesses.  (*E.g.*, Trial Tr. (Clara Datre) at 114:18–25, 115:13–18, 224:5–7 ("You assisted [your son] from time to time with monetary issues he may have had; correct?  A: Yes."); *see also* Check dated Jan. 21, 2014, Pl.'s Trial Ex. 26; Check dated Jan. 17, 2013, Pl.'s Trial Ex. 27;).  She testified that Datre Jr. repaid her directly, sometimes from the bank accounts of his businesses.  (Trial Tr.

(Clara Datre) at 116:17–23, 117:13–20). She had no written proof that the transactions were all loans. (*Id.* at 163:24–164:8). But even for loans, she "explained that a loan in the family business meant that if Thomas Datre Jr. was short on money, Thomas Datre, Sr. and Clara Datre or [Cortland] would cover the shortfall for Thomas Datre, Jr." (Stipulation of Facts ¶ 39).

Clara Datre was registered as the CEO of a company Datre Jr. supposedly owned—Datre Family Farms Inc., (Trial Tr. (Clara Datre) at 111:4–7; NYS Dep't of State Entity Information dated Apr. 4, 2020 ("2020 NYS Registration"), attached as Ex. 6 to Decl. of Paul F. Millus, Dkt. 369-6)—which had been directly involved in delivering contaminated fill to the Park. (Stipulation of Facts ¶ 28). Clara Datre testified that the state record showing her as CEO was a mistake her accountant had made, and that she never had any involvement with Datre Family Farms. (*Id.* at 124:2–12). And although she and her accountant testified that this mistake was corrected in 2012, (Trial Testimony of Roberta Vergari dated Apr. 2, 2025, Dkt. No. 376 at 349:17–350:2), other evidence suggested that as late as 2020, Clara Datre remained as the company's CEO. (2020 NYS Registration; Certificate of Incorporation of Datre Family Farms Inc dated June 5, 2008, Pl.'s Ex. 34 at 2–3; Trial Tr. (Clara Datre) at 166:13–167:12).

Separately, Datre Sr. testified that he worked on various job sites with Datre Jr., including a veterans' home construction project. (Trial Tr. (Datre Sr.) at 267:7–269:5). Datre Sr. received complaints that the "fill" provided by Datre Jr. for this project had an "issue" and was "improper." (*Id.*; Trial Tr. (Clara Datre) at 214:18–21). Datre Jr. told his father that he had done nothing illegally, even though he was later required to remove

the fill from that site.  (Trial Tr. (Datre Jr.) at 329:4–16).  Clara Datre discussed these complaints with her son, and also told him to stop his deliveries to the project.  (Trial Tr. (Clara Datre) at 215:8–23).  These events took place before any of the relevant events occurred at the Park.  (Trial Tr. (Datre Sr.) at 267:18-21, 268:2–4).

As further proof of the "big family" business was the ownership and operation of Defendant Cortland.  Datre Sr. was Cortland's Vice President, owning 40% of the company.[5]  (Stipulation of Facts ¶ 5).  At the same time, Clara Datre was its President, owning 60% of the company.  (*Id.* ¶ 8).  She testified that she held the majority stake in Cortland so they could have the designation, and presumably benefits, of a "woman-owned" business.  (Trial Tr. (Clara Datre) at 94:2–8).  And she "ran [its] office."  (*Id.* at 93:22–23).  Both Datre Sr. and Clara Datre were directors of Cortland.  (*Id.* at 94:6–7). Datre Jr. and Grabe were listed as employees at Cortland—project manager and foreman, respectively—for a project bid submitted to the Town, that was signed by Clara Datre.  (Stipulation of Facts ¶ 33).  Datre Jr. performed various services for Cortland, including getting crews ready and servicing its vehicles and equipment.  (*Id.* ¶ 41).  Datre Jr. was also listed as the emergency contact for Cortland.  (*Id.* ¶ 43).  And both Grabe and Datre Jr. were on Cortland's payroll during the period when the dumping occurred at the Park.  (Trial Tr. (Clara Datre) at 150:16–23).

There were several tractor-trailers and a dump truck that were registered to Cortland at the time of the dumping.  (Stipulation of Facts ¶¶ 10–12; Trial Tr. (Clara

---

[5] At trial—in contrast to the Stipulation of Facts—Clara Datre said she owned 51% of Cortland, and Datre Sr. owned 49%.  (Trial Tr. (Clara Datre) at 94:3–4).

Datre) at 224:20–21).  Cortland, Datre Sr., and Clara Datre paid for these and other vehicles for use by Datre Jr., held title for them, and registered them in their names. (Stipulation of Facts ¶ 35; Trial Tr. (Datre Sr.) at 260:18–20, 264:2–13 ("[W]e purchased the truck and he did everything else.")).  Defendants provided Datre Jr. with funding because he lacked sufficient creditworthiness to purchase the vehicles on his own. (Trial Tr. (Clara Datre) at 207:15–19).  Clara Datre acknowledged they purchased the trucks for Datre Jr. to "keep his business going."  (*Id.* at 133:17–25).

Defendants, despite paying for the vehicles and registering them in Cortland's name, claimed that they had no control over their use or operation, and did not own them.  (*Id.* at 94:23–25, 100:6–20, 134:18–20; Trial Tr. (Datre Sr.) at 248:8–249:13).  Datre Jr. claimed the same thing.  (Trial Tr. (Datre Jr.) at 303:4–20).  With respect to other vehicles, including trucks that she acknowledged that Cortland controlled, Clara Datre admitted that Datre Jr. would also use these vehicles for his work.  (Trial Tr. (Clara Datre) at 210:20–23).

Clara Datre also claimed that she was never paid to dump waste into the Park, and no one asked Cortland or its employees to dump materials there or paid the company for such efforts.  (*Id.* at 103:4–16).  Clara Datre also claimed not to know of Grabe's company COD, which arranged and paid for Datre Jr. to dump materials into the Park.  (*Id.* at 106:5–11).  But during the period in question—mid-2013 to mid-2014— Cortland (the company which she directed and was president of) received monies directly from COD.  (Checks (dated May 23, 2013, July 11, 2013, July 16, 2013, July 30, 2013, Aug. 7, 2013, Aug. 27, 2017), Pl.'s Trial Ex. 31 at 2–3, 5, 8–9, 12; Trial Tr. (Clara

Datre) at 201:2–19).  Clara Datre claimed that the checks were repayment for loans that she regularly made to Datre Jr. (Trial Tr. (Clara Datre) at 118:2–5).  Datre Jr., rather than "tak[ing] the money from COD, deposit[ing] it into his own account" and then writing a check to his mother for any loan repayments, simply "diverted checks from the company that was giving him contaminated fill" to her.  (*Id.* at 161:23–162:3; *see also id.* at 201:2–10).  She indicated she only later learned that that the monies came from the company that was paying Datre Jr. to dump waste into the Park.  (*Id.* at 162:3–4, 163:1–6).  During the period in which the dumping occurred, Grabe's companies paid over $ 600,000 combined to Cortland and to companies run by Datre Jr.  (Stipulation of Facts ¶ 28; Trial Tr. (Datre Jr.) at 289:10–12, 302:12–14, 334:21–24).

In the end, the Town paid $ 4,572,932 to clean up the Park, of which $ 4,318,632 has not been reimbursed.  (Trial Testimony of Robert Kordic dated Apr. 1, 2025, Dkt. No. 375 at 235:10-12, 235:19-22).

## PROCEDURAL HISTORY

The Town commenced this action on April 29, 2016.  (Compl. dated Apr. 29, 2016, Dkt. No. 1 at 64).  The operative complaint—the Second Amended Complaint—contained 16 claims against a variety of defendants: two civil Racketeer Influenced and Corrupt Organizations Act claims, (Second Am. Compl. ¶¶ 160–99); two CERCLA claims, (*id.* ¶¶ 200–22); and a variety of state law claims for negligence, public nuisance, private nuisance, trespass, among others.  (*Id.* ¶¶ 223–95).  All of the claims centered on the contamination of the Park resulting from dumping of construction, demolition debris, and hazardous substances.  (*Id.* ¶ 1).

Over the years of litigation, many of the original defendants were dropped from the case, because of settlement or default (including an Entry of Default against Datre Jr.), and with them, many of the claims.[6]  (JPTO at 1–3).  By the time the Court held a final pretrial conference, there were four remaining defendants: Datre Sr., Clara Datre, and two corporations—Cortland and Daytree Customer Builders Inc.  (*Id.*).  Additionally, the only remaining claims against the four defendants were: 1) a claim alleging that Datre Sr., Clara Datre, and Cortland were liable as transporters under CERCLA, 42 U.S.C. §§ 9607(a)(4) and 9613(f)(3)(b); 2) a claim for state common law negligence; and 3) a claim for state common law public nuisance.  (*Id.* at 3–4).

Following the presentation of all the evidence, before the case was submitted to the jury, Defendants moved for relief pursuant to Rule 50(a).  (Defs.' First JMOL Mot.; Minute Entry dated Apr. 2, 2025).  At the charge conference, the Court granted Defendants' motion, in part, dismissing several claims with prejudice: (1) the Town's claims under CERCLA, (Trial Tr. dated Apr. 2, 2025 ("Charge Conf."), Dkt. No. 376 at 401:3–406:23), and for common-law negligence, against all Defendants, (*id.* at 409:14–411:24, 429:14–432:9); and (2) all claims against defendant Daytree Custom Builders Inc, (*id.* at 425:17–25).  (*See also* Minute Entry dated Apr. 2, 2025).

The Court denied the Rule 50(a) motion seeking dismissal of the claim for public nuisance against the three remaining Defendants, and that claim was submitted to the

---

[6] *See, e.g.*, *Town of Islip v. Datre*, 245 F. Supp. 3d 397 (E.D.N.Y. 2017); *Town of Islip*, 2022 WL 445680; (Orders Approving Settlement dated Nov. 18, 2019, Dkt. Nos. 253–57; dated June 1, 2021, Dkt. No. 303; dated June 1, 2021, Dkt. No. 304; dated Aug. 20, 2021, Dkt. No. 313; dated Apr. 14, 2022, Dkt. No. 321; dated Apr. 5, 2023, Dkt. No. 324); (Clerk's Entry of Default dated Feb. 28, 2020, Dkt. No. 279).

jury.  (*Id.*).  While instructing the jury, Court defined direct and circumstantial evidence, explaining that "[t]here is no distinction between the weights to be given to these two types of evidence."  (Jury Instrs. filed Apr. 2, 2025 ("Jury Instrs."), Dkt. No. 358 at 5). The Court's substantive instruction on the public nuisance claim was as follows:

> Plaintiff has alleged that each Defendant has created a public nuisance by interfering with the public right to use Roberto Clemente Park.  For this particular claim, Plaintiff bears the burden of proving each element by clear and convincing evidence that a Defendant caused a public nuisance.
>
> To prevail on a public nuisance claim under New York law against a defendant, a Plaintiff must establish that two elements by **clear and convincing** evidence:
>
> First, that there was a public nuisance—a substantial and unreasonable interference with a right common to the public;
>
> Second, negligent or intentional conduct by a defendant that creates, contributes to or maintains that public nuisance.
>
> <u>First Element</u>: Conduct that Amounts to Substantial Interference
>
> With respect to the first element, the Plaintiff must prove there was a substantial interference with a public right.  An interference with a public right occurs when the health, safety, or comfort of a considerable number of persons in New York is endangered or injured, or the use by the public of a public place is hindered.
>
> To be substantial, an interference with a public right must be real and appreciable, not imagined or petty.  The test is not what disturbs or annoys, but whether a reasonable person in the same area would be annoyed or disturbed by the interference.
>
> In determining whether the interference is unreasonable . . . you must consider all factors including the location and nature of the place in question; the nature of a defendant's business; the nature and degree of the danger to the public; whether the conduct is prohibited or permitted by statute, ordinance, or administrative regulation; whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect; and how, if at all, the danger could be reduced.

13

<u>Second Element</u>: Intentional or Negligent Interference

With respect to the second element, a plaintiff may establish this element either through proof that the defendant acted **intentionally** or **negligently**.

Whether the conduct is intentional or negligent, the plaintiff only proves this element if the defendant's conduct creates or contributes to, or maintains, the public nuisance.

To prove a defendant acted intentionally, the plaintiff must show that the defendant acts for the purpose of interfering with the public's use and enjoyment of the land, or knows that such interference will result or is substantially certain to result from its conduct, or becomes aware that its conduct is causing substantial interference and nevertheless continues it.

Alternatively, to prove a defendant acted negligently, the plaintiff must establish that a defendant acted without exercising ordinary care. It is a failure to use that degree of care that a reasonably prudent person would not have done under the same circumstances, or, on the other hand, from failing to do an act that a reasonably prudent person would have done under the same circumstances.

Where the plaintiff is seeking to prove that a defendant acted negligently in connection with an injury caused by the conduct of a third-party, the plaintiff must prove that the defendant had a duty to control the actions of the third-party. A duty to control the conduct of a third party arises only where there is a relationship between defendant and the third-party that includes the defendant's actual control over the third-party's actions. Absent actual control, there is generally no duty to control the conduct of third parties so as to prevent them from harming others, even where, as a practical matter, the defendant can or has the ability to control the third party's conduct.

If you find that Plaintiff met its burden to prove both of the elements, by clear and convincing evidence, of its public nuisance claim against a Defendant, you must enter a verdict for the Plaintiff and against that Defendant on that claim. On the other hand, if you find that the Plaintiff has failed to meet its burden of proof on either element against a Defendant, you must enter a verdict for that Defendant on this claim.[7]

---

[7] Neither party sought a more detailed instruction for public nuisance, including a causation instruction, or objected to these instructions. (*See* Defs.' Proposed Jury Instrs. dated Mar. 7, 2025 ("Defs.' Proposed Jury Instrs."), Dkt. No. 350 ¶¶ 59–71; Pl.'s Proposed Jury Instrs. dated Mar. 7, 2025 ("Pl.'s Proposed Jury Instrs."), Dkt. No. 344 at

(Jury Instrs. at 11–15; Trial Tr. dated Apr. 2, 2025 ("Tr. of Jury Instrs."), Dkt. No. 376 at 446:19–449:25).  The verdict sheet distinguished between holding each Defendant liable on a theory of conduct that was intentional, negligent, or both.  (Verdict Sheet at 1–2).  The jury reached a verdict finding that all three Defendants were negligently liable for the claim of public nuisance.  (*Id.*).  Defendants subsequently filed their renewed motion for judgment as a matter of law.

DISCUSSION

## I.     Standard for Motion for Judgment as a Matter of Law

"A district court may grant a motion for judgment as a matter of law in a jury trial if it finds 'that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party' opposing the request."  *Ortiz v. Stambach*, 137 F.4th 48, 60 (2d Cir. 2025) (quoting Fed. R. Civ. P. 50(a)(1)).  "In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been

---

5–6).  Although Defendants proposed a damages instruction initially, that request was limited to the original negligence claim, not public nuisance.  (Defs.' Proposed Jury Instrs. ¶¶ 55–58).  And, although they did include a damages entry in their proposed verdict sheet, (Defs.' Proposed Verdict Sheet dated Mar. 7, 2025, Dkt No. 351 at 20), they did not object to its absence in the final verdict sheet during either the final pretrial conference, (*see* Hearing Tr. dated Mar. 26, 2025, Dkt. No. 373 at 33:22–37:23), and did not raise the issue at the charge conference or in either their first or second Rule 50 motions. Nor did the Town seek a damages instructions during any conference. Presumably, this was because the parties agreed that this was either a matter for the Court or not in dispute (or both)—and to be measured by the clean-up costs incurred by the Town.  Defendants offered no contrary evidence on the amount of the clean–up costs.  *See supra* at 11.

drawn by the jury." *Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999); *see also Carulo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (same). The district court "must draw all reasonable inferences in favor of the nonmoving party . . . [and] although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007)* (emphases, internal quotations, and citation omitted). "[A] court may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Id. at 370–71* (emphasis, internal quotations, and citation omitted);

> Thus, a court may not grant judgment as a matter of law unless: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it."

*Ortiz*, 137 F.4th at 61 (quoting *Williams*, 171 F.3d at 101).

Additionally, a [Rule 50(b)] motion "is limited to those grounds that were 'specifically raised in the prior [Rule 50(a)] motion[.]'" *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997)). If "it concludes that the evidence is legally insufficient," *Unitherm*

*Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006), the court has the "discretion to choose between ordering a new trial and entering judgment[.]"  *Id.* at 402.[8]

Defendants moved for judgment as a matter of law under Rule 50(a), requesting dismissal of all claims before the case went to the jury.  (Defs.' First JMOL Mot.).  That motion raised the same argument now before the Court, namely that the public nuisance claim was not supported by sufficient evidence for the jury to find in the Town's favor.  (*Id.* at 7).

For the reasons explained below, the jury had more than sufficient evidence to conclude that Defendants are negligently liable for public nuisance, and therefore, the Court directs the entry of judgment in favor of the Town.

## II.     Negligence for Public Nuisance

"To prevail on a public nuisance claim under New York law, a plaintiff must show that the defendant's conduct 'amounts to a substantial interference with the exercise of a common right of the public,' thereby 'endangering or injuring the property, health, safety or comfort of a considerable number of persons.'"  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (quoting *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 292 (2001)) [hereinafter *In re*

---

[8] Pursuant to Rule 59, "[t]he court may, on motion, grant a new trial," or, on its own initiative or for reasons not in the motion, "[n]o later than 28 days after the entry of judgment . . . may order a new trial for any reason that would justify granting one on a party's motion."  Here, neither the first Rule 50 motion nor the renewed motion requested a new trial.  (*See generally* Defs.' First JMOL Mot.; Defs.' Second JMOL Mot.; *see also* Pl.'s Mem. of Law in Opp'n dated May 9, 2025 ("Pl.'s Opp'n"), Dkt. No. 370 at 4 n.1).

*MTBE*].  The conduct giving rise to liability can be either intentional or negligent.

*Copart Indus., Inc. v. Consol. Edison Co. of New York*, 41 N.Y.2d 564, 569 (1977)

("[N]egligence is merely one type of conduct which may give rise to a nuisance.").[9]

These elements—substantial interference with a public right, and conduct by a

defendant that causes it—must be proven by clear and convincing evidence.  N.Y.

Pattern Jury Instr. (Dec. 2024) § 3:17 ("The burden of proof is on plaintiff to establish, by

clear and convincing evidence, a substantial and unreasonable interference with the

public right[.]"); *DeStefano v. Emergency Hous. Grp., Inc.*, 281 A.D.2d 449, 451 (2001)

(collecting cases).

    Defendants do not dispute that the dumping of the materials endangered

residents who used the Park, and that such dumping constituted substantial

interference with a public right.  The only dispute is whether the Defendants' conduct

caused or contributed to that interference.

    Defendants argue that there was no evidence of actual control by them over

Datre Jr. or any of the other parties already found responsible for the dumping.  (Defs.'

Reply Mem. of Law filed May 22, 2025 ("Defs.' Reply"), Dkt. No. 371 at 1–4).  And

consequently, they contend that there can be no liability for a public nuisance.  But

---

[9] A public nuisance claim generally may be pursued only by an appropriate governmental agency or instrumentality.  *In re MTBE*, 725 F.3d at 121 (citing *Copart*, 41 N.Y.2d at 568).  There is no dispute that the Town is legally capable of bringing the claim against Defendants.

Defendants' argument rests solely on the Town's alleged failure to prove Defendants' *vicarious* liability for Datre Jr.'s conduct.[10]

In other words, the motion does not address the possibility that the jury found Defendants *directly* responsible—through their own negligence—for the nuisance.[11]  *Cf. Coffey v. Flower City Carting & Excavating Co.*, 2 A.D.2d 191, 192 (1956) ("If . . . [defendant] had no control over the loading and unloading operations, did not participate therein, and had neither actual nor constructive notice of any improper

---

[10] Vicarious liability is an exception to the general common law rule that a person is responsible only for his or actions and that the plaintiff can therefore sue only the person who inflicted the harm.  Under the doctrine of vicarious liability, by reason of some relationship existing between two parties . . .  a defendant who played no part in the occurrence causing the plaintiff's injury may be held legally responsible for the plaintiff's injury caused by the tort of another person.

14 N.Y.Prac., New York Law of Torts (Aug. 2023) § 9:2.  Where a plaintiff seeks to prove a defendant acted negligently in connection with an injury caused solely by the conduct of a third party, the plaintiff must prove that a defendant had a duty to control the actions of that third party.  *Oddo v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 28 N.Y.3d 731, 736 (2017).  Such a duty generally arises only when the defendant had "actual control" over the third party's actions.  *Id.*

[11] At closing, counsel focused too narrowly on one theory, arguing only that Defendants "had no control over the day-to-day affairs of [Datre Jr.'s] business, in the same way that he had no control over the day-to-day affairs of [Defendants'] business." (Trial Tr. (Closings) at 453:15–17.  And he added, "this case is nothing more than the Town trying to hold the parents responsible for the acts of their son."  (*Id.* at 460:16–17). But it was about more, as the Town's counsel argued: "I'm not blaming these folks for the sins of their son.  I'm saying they're all one for the purposes of what took place here, based upon circumstantial evidence, which you are allowed to consider and put together."  (*Id.* at 464:4–8).

loading, then *that defendant cannot be held liable to the plaintiff, except for its own active negligence*." (emphasis added)), *aff'd,* 2 N.Y.2d 898 (1957).

Indeed, the Town argues that they never sought to hold Defendants responsible by failing to control the acts of a third party, and expressly disavow this vicarious liability theory.[12]  (Pl.'s Opp'n at 10).  They instead argue that each Defendant was, itself, directly responsible—through its own negligence—for contributing to the public nuisance.  (*Id.*).  And this negligence took the form of assisting Datre Jr.'s activities, but not engaging in appropriate oversight of those activities: funding and providing the equipment with which the dumping was done; funding their son's businesses over time, even in the face of knowledge that his conduct had been questioned at an earlier construction project; operating, to various extents, the corporations that participated in the dumping; employing the same two individuals who undisputably were involved in the illegal dumping (Grabe and Datre Jr.); receiving payments from third-party corporations involved in the dumping without questioning the source of the funds; and holding officer positions within the corporations without tracking the impact of the activities of the corporation's trucks, personnel, or employees, including Datre Jr. himself.

---

[12] The Court is baffled why in closing, and now on this motion, the Town disavowed the third-party control theory.  In the Court's view, there was ample evidence for liability on that basis, which is why the Court included the instruction in the first place, but with the Town having abandoned it, cannot affirm the verdict on this theory.  This creates an admittedly close call in evaluating the outcome of this trial, because the Town must rely entirely on circumstantial evidence to establish liability.

In one sense, this failure easily resolves this motion.  By not addressing a legal and factual theory plainly presented to the jury—one that is an independent basis for imposing liability—Defendants simply cannot prevail.  *See Galdieri-Ambrosini*, 136 F.3d at 286.  Defendants did not object to the jury instructions that permitted the jury to conclude that they were directly responsible.  (Jury Instrs. at 13 ("[T]o prove a defendant acted negligently, the plaintiff must establish that a defendant acted without exercising ordinary care."); Tr. of Jury Instrs. at 448:20–22).  And they also did not make *any* argument in their initial Rule 50(a) motion that the evidence was insufficient under a direct negligence theory.  (*See* Defs.' First JMOL Mot.).  Their only argument in the initial and present motion was that the evidence was insufficient under a vicarious liability theory (a theory under which a defendant negligently or intentionally controls a party that is the ultimate polluter, but otherwise has no other involvement in the conduct).[13]

Nonetheless, despite Defendants' failure to raise this argument, the Court explains why this theory of direct negligence is both legally viable under New York

---

[13] Defendants argue that the jury was instructed that to find negligent liability, there must be "a finding that the Defendants owed a duty to the Town of Islip to control the conduct of the third party[.]"  (Mem. of Law in Supp. of Defs.' Mot. for J. filed Apr. 17, 2025 ("Defs.' Mem."), Dkt. No. 364-3 at 1).  That is not what the instructions say: they provided that "[w]*here the plaintiff is seeking* to prove that a defendant acted negligently in connection with an injury caused by the conduct of a third-party, the plaintiff must prove that the defendant had a duty to control the actions of the third-party."  (Jury Instrs. at 13 (emphasis added)).

law, and sufficient evidence existed for the jury to find Defendants engaged in acts that negligently caused the public nuisance (even under a clear and convincing standard).[14]

As noted, a public nuisance conduct can be based upon on negligent conduct:

Claims of public nuisance arising in part out of the negligent conduct of one or more defendants differ in some respects from a traditional cause of action for negligence. Where a nuisance is based on negligence, a plaintiff must still prove a duty of care and subsequent breach, but the duty at issue is to the public or to a substantial number of persons.

*City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 345 (E.D.N.Y. 2007). The elements mimic those of a traditional negligence claim: duty, breach, causation, and damages. *Id.* at 345–47.

In a traditional negligence claim, an individual has a duty only to those to whom they have a special or legally recognized relationship. *532 Madison*, 96 N.Y.2d at 289. To that end, "some jurisdictions require a control element for public nuisance claims[.]" *Suffolk Cnty. Water Auth. v. Dow Chem. Co*, No. 17-CV-6980, 2025 WL 1907206, at *31 (E.D.N.Y. July 10, 2025). But other jurisdictions, including New York, recognizing that the tort imposes a duty "to the public," *id.* at 32, "hold that nuisance claims are not so limited." *Id.* at *31 (collecting cases). "Under New York law, '[e]very one who creates a nuisance or participates in the creation or maintenance thereof is liable for it.'" *In re MTBE*, 725 F.3d at 121 (quoting *Penn Cent. Transp. Co. v. Singer Warehouse & Trucking Corp.*, 86 A.D.2d 826 (1st Dep't 1982)).

---

[14] The Town also asked the Court to provide an instruction on acting in concert or conspiracy. (*E.g.*, Charge Conf. at 420:21–422:18). The Court declined to give such an instruction, because the Town failed to provide any legal authority for it. (*Id.* at 422:14–18).

Defendants' motion ignores the legal reality that participation in the creation of a public nuisance—even if the defendant lacked control over the ultimate polluter—can give rise to liability.  Two cases illustrate the point.

In *Suffolk County Water Authority*, the plaintiff, which operated county water wells, sued three chemical manufacturers of a cleaning product that contained a chemical identified by the EPA as a "probable human carcinogen."  2025 WL 1907206, at *1.  Plaintiff alleged that the manufacturers had polluted the wells, and among its claims was one for public nuisance.  *Id.* at *29–*30.  Defendants agreed that the contamination constituted a nuisance, but contended they could not be liable because they only introduced products "in the stream of commerce," and contamination had been caused by users of the cleaning product.  *Id.* at *30–*32.  The District Court rejected that argument, noting that New York law "permits a jury to conclude that a chemical manufacturer substantially participated in the creation of a nuisance even *without* evidence that the manufacturer *had control over the end users' conduct*."  *Id.* at *31 (emphases added).  And it declined to dismiss the claim.  A jury could conclude that the manufacturers could foresee that their conduct could harm the drinking water, and were negligent in not taking due care to alter their conduct which foreseeably has such a public impact.  *Id.* at *32.

In a similar case, *In re MTBE*, New York City and State agencies sued Exxon for using a gasoline additive—identified as a potential carcinogen—that leeched into the groundwater, contaminating wells in Queens when it leaked from underground storage tanks.  725 F.3d at 78.  One of the many claims was for public nuisance, and Exxon

argued that its participation—as a manufacturer or supplier—was too remote for liability to attach. *Id.* at 121–22. The Second Circuit rejected the argument, noting that under New York law, participation in nuisance creation can lead to liability; and a jury could reasonably conclude that Exxon's participation in the Queens gas market (including supplying to station owners and marketing to Queens customers) was sufficient participation. *Id.* at 122–23.[15]

Liability for participation is not limitless, however. *First*, the participation itself must be substantial. Restatement (Second) of Torts § 834 (Am. L. Inst. 1979) ("One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on."); *e.g.*, *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 548 (S.D.N.Y. 2022):

> [C]ourts have held that the Restatement language requiring that the defendant have "participated to a substantial extent" in the nuisance-creating activity was also satisfied when there was evidence that the defendant, having sold a toxic or dangerous substance to an identified third party, continued to sell the same product to the third party for a profit

---

[15] Both parties were ill-prepared to argue a public nuisance claim at trial and on this motion. In their opposition to Defendants' motion, the Town failed to provide the Court with any legal authority on which to rest their theory of direct negligence. Indeed, the Town cites only six cases in its entire brief, none of which address the standard for negligence in a public nuisance claim. Defendants do no better in their papers, citing to countless cases unrelated to nuisance.

And both failed to cite any relevant authority on nuisance to the Court in their proposed jury instructions, (*see* Defs.' Proposed Jury Instrs. at 12–18; Pl.'s Proposed Jury Instrs. at 5–7), or at the charge conference. (Charge Conf. at 430:24–432:17). "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all men[.]" *Copart Indus.*, 41 N.Y.2d at 565 (citing Prosser on Torts (4th ed.)). But that does not excuse able lawyers from the difficulty, leaving the Court to do all the hard work for them.

knowing that that third party would continue to use it in a manner that maintained the nuisance.[16]

*Second*, a defendant must play "a sufficiently direct role in causing" the nuisance. *Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 101 (2d Cir. 2013). A "sufficiently direct role," is alternatively referred to as "substantial factor" causation: a defendant's participation need not be the sole or primary factor in bringing about the nuisance; it need only have had "such an effect in producing the injury that reasonable people would regard it as a cause of the injury." *In re MTBE*, 725 F.3d at 116. Determining whether conduct—and in this case negligence—is a substantial factor requires consideration of "principles of proximate causation, including foreseeability[.]" *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, No. 20-CV-10731, 2023 WL 2601161, at *6 (S.D.N.Y. Mar. 22, 2023); *see also Janki Bai Sahu*, 528 F. App'x at 101 ("[C]ourts are not to lay aside traditional notions of remoteness, [and] proximate cause . . . when evaluating public nuisance claims.").[17] A defendant may be held liable for a public nuisance by "setting in motion or being a force in the sequence of events resulting in injury to the public." *City of New York*, 247 F.R.D. at 347; *e.g.*, *State v. Schenectady*

---

[16] *See, e.g.*, *Shockley v. Hoechst Celanese Corp.*, 996 F.2d 1212, at *4 (4th Cir. 1993) (per curiam) (unpublished table decision) (holding that the jury could have reasonably found that when defendant knowingly shipped "hazardous waste . . . to a deficient waste processor, [he] substantially participated in the nuisance").

[17] Another component of proximate cause is a direct relationship—evaluated separately from "substantial factor," *see Laborers Loc. 17 Hlth & Ben. Fund. v. Philip Morris*, 191 F.3d 229, 235 (2d Cir. 1999)—which requires that any injury suffered by a plaintiff be direct. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) ("[A] demand for some direct relation between the injury asserted and the injurious conduct alleged.").

*Chemicals, Inc.*, 479 N.Y.S.2d 1010, 1014 (1984) (permitting public nuisance claim against chemical manufacturer to proceed based on theory that negligent hiring of waste disposer, who contaminated site, caused environmental harm). But "remote, indirect involvement of a defendant with no knowledge of the potential downstream consequences of its actions" is insufficient. *Cangemi v. United States*, 13 F.4th 115, 138 n.15 (2d Cir. 2021). And the evaluation of "whether a particular act of negligence is a substantial cause of the plaintiff's injuries" is typically made by a jury, since "questions of . . . what is foreseeable and what is normal may be the subject of varying inferences." *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (quotations omitted).[18]

Defendants, to be clear, do not attack (and did not object to) the Court's jury instructions that participation in creating a public nuisance is sufficient for liability.[19]

---

[18] Substantial participation in the creation of a nuisance and substantial factor causation are related concepts—and courts often treat them interchangeably. But they are distinct. Substantial participation requires that the conduct be tortious—in the case here, negligent—and significant. *Suez*, 2023 WL 2601161, at *14; *see also 532 Madison*, 96 N.Y.2d at 292 ("A nuisance . . . may arise from varying types of conduct[.]"). Causation addresses the connection between defendant's conduct and the nuisance. *Laborers*, 191 F.3d at 235 ("[P]roximate causation is the requirement that there be some direct relation between the injury asserted and the injurious conduct alleged." (quotations omitted)).

[19] The only argument in the Rule 50 motion that could be read as attacking the legal—as opposed to the factual—basis for the verdict is Defendants' contention that the liability was based on a non-existent duty to the world. But that argument is based on cases that do not reference public nuisance. *See supra* note 9. A vanilla negligence claim requires existence of a specific duty; but a public nuisance implicates a broad duty owed to the public writ-large. *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 489–91 (E.D.N.Y. 2003):

> [P]ublic nuisance is in its essence an offense against the state; an action sounding in public nuisance seeks redress for a wrong common to the public. Precisely the opposite holds true in individual negligence cases,

Nor did the Defendants ever ask for a more detailed or specific causation instruction beyond what the Court gave.  (Charge Conf. at 448:9–12 ("[T]he plaintiff only proves this element if the defendant's conduct creates or contributes to or maintains the public nuisance.")).  As the preceding discussion illustrates, participation—with or without control—is sufficient for public nuisance liability.  As discussed below, the record evidence was sufficient for a reasonable jury to conclude that Defendants participated to a substantial extent and that their conduct was a sufficiently direct cause of the injury suffered—even when measured against a clear and convincing benchmark.

## III.    Sufficiency of the Evidence

A jury could rationally conclude that Datre Sr. and Clara Datre knew their son was using, or was likely to use, their trucks for an illegal dumping given his past conduct.  And whether by virtue of lending money to Datre Jr., allowing him to use their trucks, sharing employees, accepting payment from a participant in the scheme (COD), or some other rational inference, the jury could conclude that they did not act with ordinary care under the circumstances, such that they were themselves a substantial participant in creating or contributing to a public nuisance by funding it, supplying equipment that effected its execution, and/or profiting from it.  This is particularly true if they found that none of the individuals Defendants—or Datre Jr.—

---

where the aim is to redress a wrong visited upon a specific injured party by an identified person who owes him or her a specific duty.

(internal quotations and citations omitted).  Liability is limited by the other requirements, however, including causation (and its subcomponent foreseeability).

were credible, an inference that the Town asked the jury to draw. (*See* Trial Tr. (Closings) at 463:22–464:4).

In some sense, this case is unique. Many of the cases in which remote conduct was sufficient for nuisance liability involve groundwater contamination by a manufacturer or seller. *E.g.*, *In re MTBE*, 725 F.3d at 121–23; *Suffolk Cnty. Water Auth.*, 2025 WL 1907206, at *29–*32. And in such cases, the manufacturer and seller were held liable because of conduct that went beyond merely supplying the offending pollutant: knowledge that there were downstream effects from their sales (including improper disposal); continued sales in the face of such knowledge; and deliberate purposeful conduct (like targeted marketing) directed at the geographic area impacted by the nuisance. *Suffolk Cnty. Water Auth.*, 2025 WL 1907206, at *29–*32. As one court recently explained:

> Courts in this Circuit have sustained claims for groundwater contamination against causation challenges if the plaintiff has plausibly alleged that an upstream manufacturing defendant (1) marketed or sold the product to customers who used the product near the contaminated groundwater; (2) held a significant percentage of the relevant market; and (3) contributed to the contamination, either directly by releasing the contaminants into the environment, or indirectly by advising persons who purchased from it the contaminating products to release the contaminants into the environment with knowledge that the recommended disposal methods would likely lead to contamination.

*SUEZ*, 2023 WL 2601161, at *6; *c.f. Redevelopment Agency of Stockton v. BNSF Railway Company*, 643 F.3d 668, 674 (9th Cir. 2011) ("Because the Railroads' conduct with regard to the specific nuisance condition—the contamination—was not active, affirmative, or

knowing, the Railroads simply did not 'create or assist in the creation' of the nuisance[.]").

The present case is not chemical water contamination.  It is dumping of physical waste that had to be excavated and removed.  No sales or manufacturing of pollutants are involved.  The dumping took place over nearly an entire year in a discrete location—a single park.  Defendants claimed that they did not pick the site, monitor the job, receive proceeds, or know anything about any dumping until it was completed.  However, although Defendants may have testified to that end, the jury was entitled not to believe them.

The jury could have concluded from Defendants' own testimony that the Defendants owned the trucks that dumped the waste; stored those trucks on their lot; served as owners or officers of the corporation that provided and owned the trucks that did the dumping; and ran their son's companies—the one that did the dumping—as their own, and/or as part of a "family business" located in the same building on which they paid rent, and which they kept afloat through large monetary gifts, not loans.

The jury could easily have concluded that the Defendants were lying when they said they did not know about the dumping, because they knew that their son and their corporation had been flagged for similar misconduct earlier.  (Trial Tr. (Datre Sr.) at 266:19–268:4).  The jury was not obligated "to credit [Defendants'] version of events[.]"  *Ortiz*, 137 F.4th at 62.  "[T]here was more than sufficient circumstantial evidence from which a rational jury could find that [Defendants were] not credible[.]"  *Id.* at 63.  Indeed, for the jury to conclude that Datre Sr. and Clare Datre were being

truthful required them to also believe their son, Datre Jr., who parroted their testimony, but lost all credibility when he could not admit that he had committed the dumping himself. (Trial Tr. (Datre Jr.) at 337:23–338:21). Furthermore, as the Town points out, the Defendants'

> denials of knowledge or lack of involvement were called into question by the use of vehicles registered to them to contaminate the Park, their receipt of funds from one of the contaminating parties, [COD], [and] their exchange of funds and equipment between all of the companies owned by them and their son[.]

(Pl.'s Opp'n at 2). The trucks used by Datre Jr. were all registered to Cortland, and were "used during the relevant time period where [Datre Sr.] was Vice President and Clara Datre was President, owning 40 and 60%, respectively, of that company." (*Id.* at 7).

If the jury reached that plausible conclusion—that these Defendants, rather than being ignorant, knew about the dumping, or the possibility of dumping—this case becomes like those involving groundwater pollution. That is, a case where the liable defendants acted either knowingly and in furtherance of the nuisance, or should have known of the likelihood of a nuisance resulting from their conduct, even if they did not do the final dumping or disposal themselves.

By failing to take due care to prevent the corporation they controlled and ran from engaging in illegal dumping, financing and operating trucks that they permitted Datre Jr. to operate without any oversight, personally financing Datre Jr.'s businesses, and receiving payments from another company definitively involved in the dumping, a jury could draw the conclusion that these Defendants—by not taking due care to stop

that conduct—contributed to, *i.e.*, played a substantial part in creating, and were a sufficiently direct cause of, that nuisance.[20]

Such a conclusion is entirely consistent with, not at odds with, the fact that Datre Jr. is the one who actually drove and dumped hazardous material.

> If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's . . . tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

Restatement (Second) of Torts § 439 (Am. L. Inst. 1965). *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003) ("The common law of torts, however, instructs that the existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury.") (collecting cases).

---

[20] The Supreme Court of Iowa reached the same conclusion in a factually similar case—finding a landlord liable for his tenant's nuisance-creation:

> Here, as mentioned, substantial evidence supports the district court's finding that the operation of the ready mix plant constituted a nuisance. The evidence establishes that Sandbulte is the owner of the property upon which the ready mix plant is located and that he personally applied for the building permits for the plant. The evidence also establishes that at the time Sandbulte leased the property to Joe's Ready Mix, he knew activities of a ready mix plant would be carried on by Joe's Ready Mix, and he consented to those activities. In fact, he purchased the property intending to build a ready mix plant on it. The Harms' protests to the conditions that would be created by the plant were made known to Sandbulte before the rezoning and the construction of the plant. Moreover, Sandbulte has been president of Joe's Ready Mix for a number of years and oversees all operations. Joe's Ready Mix operates a number of other ready mix plants, so Sandbulte is well acquainted with the activities that take place at ready mix plants.

*Harms v. City of Sibley*, 702 N.W.2d 91, 104 (Iowa 2005).

Courts in this circuit have routinely held that where a party was a substantial

participant in creating a public nuisance—even where the party lacked control over a

third party—that party may be held liable.  *See, e.g., Suffolk Cnty. Water Auth.*, 2025 WL

1907206, at *32 ("The Defendants have not shown as a matter of law, on the factual

record before the court, that the creation of a public nuisance was not foreseeable."); *see*

*also In re MTBE*, 725 F.3d at 121–23; *Hicksville Water Dist. v. Philips Elecs. N. Am. Corp.*,

No. 17-CV-4442, 2018 WL 1542670, at *7–*8 (E.D.N.Y. Mar. 29, 2018); *City of New York*,

247 F.R.D. at 348–49.[21]

Defendants separately argue that there was insufficient evidence to pierce the

corporate veil.  (Defs.' Mem. at 4).  This argument was never raised at the final pretrial

conference, during trial, or at the charge conference, and Defendants did not request

any veil piercing instruction.  But, in any event, the argument has no merit.  The scope

of nuisance liability is sufficient to encompass Datre Sr.'s and Claire Datre's liability,

without resorting to veil piercing theories.  Veil piercing is only necessary when a

person is being held liable solely based on their status as a company officer.  But when

the defendant—who happens to also be a corporate officer—"specifically directs,

---

[21] Here the evidence of liability was almost entirely circumstantial.  But it does
not make the jury's verdict any less reasonable.  "Juries are frequently (and correctly)
instructed, as they were here, that the law makes no distinction between the weight to
be given to either direct or circumstantial evidence."  *Tyler v. Bethlehem Steel Corp.*, 958
F.2d 1176, 1184 (2d Cir. 1992) (alteration adopted) (quotations omitted); *United States v.
Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) ("[T]he jury's verdict may be based entirely on
circumstantial evidence, and may be inferred from the evidence, so long as the
inference is reasonable, for it is the task of the jury, not the court, to choose among
competing inferences[.]" (citations and quotations omitted)); *United States v. Casamento*,
887 F.2d 1141, 1156 (2d Cir. 1989) ("Circumstantial evidence, it should be noted, if relied
upon by the jury, is of no lesser probative value than direct evidence.").

sanctions, and actively participates in . . . maintenance of the nuisance," liability attaches.  *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir. 1985) ("[W]e hold [individual defendant] liable for the abatement of the nuisance without piercing the corporate veil.").  That is consistent with the general principle of New York law that "piercing the corporate veil is not required to hold a corporate officer liable for his company's torts: 'a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation.'" *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 163 (S.D.N.Y. 2010) (quoting *Shore Realty*, 759 F.2d at 1052), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011).

<u>CONCLUSION</u>

For the aforementioned reasons, the Court cannot conclude that a reasonable jury lacked a legally sufficient evidentiary basis to find Defendants negligently liable for public nuisance.  The motion is denied.

The Clerk of Court is directed to enter judgment in favor of the Town of Islip as follows:

1.  Against Defendants Thomas Datre Sr., Clara Datre, and Cortland on the claim of public nuisance in the amount of $ 4,318,632 plus pre-judgment interest in an amount to be calculated by the Clerk (following submission by the Town), and post-judgment interest until the judgment is paid.  28 U.S.C. § 1961.

2.  The remaining claims against these Defendants are dismissed with prejudice, including all claims against Daytree Custom Builders Inc.

The Town should inform the Court by August 25, 2025 whether it intends to pursue default judgment against the defaulting parties.  The Clerk is instructed not to enter final judgment until litigation against all parties has concluded.

SO ORDERED.

*/s/ Sanket J. Bulsara*

SANKET J. BULSARA

United States District Judge

Date:  August 18, 2025

Central Islip, New York

34